Argued and submitted June 3, 2004, affirmed February 15, 2006

BATZER CONSTRUCTION, INC.
and John Batzer,
*Respondents,*

*v.*

John BOYER,
*Appellant.*

00-2145-L-1; A119350

129 P3d 773

Clayton C. Patrick argued the cause and filed the briefs for appellant.

Joseph E. Kellerman argued the cause for respondents. With him on the brief were Charles E. Bolen and Hornecker, Cowling, Hassen & Heysell, L.L.P.

Before Landau, Presiding Judge, and Brewer, Chief Judge, and Armstrong, Judge.

ARMSTRONG, J.

**ARMSTRONG, J.**

Defendant appeals a judgment for plaintiffs in a contract action. He assigns error to the trial court's grant of a directed verdict for plaintiffs on their claim and on his counterclaims. Plaintiffs cross-assign error to the trial court's ruling that defendant's counterclaims were not time barred by ORS 12.110(1), the general tort statute of limitation. We affirm.

Defendant and plaintiffs built buildings for lease to the United States Postal Service (USPS). Each party performed specific tasks to further that endeavor. Defendant found suitable land, purchased the land, and handled most of the negotiations with the USPS. The plaintiffs prepared bids and, if the USPS accepted the bids, constructed the buildings. The bids consisted of a per annum rent amount that plaintiffs and defendant calculated based on estimates of how much it would cost to build the buildings. After the USPS accepted a bid, it could alter the building plans that formed the basis for the bid. If the change would increase the cost of the project, defendant and plaintiffs, as co-owners, could submit a change order to the USPS for the additional cost. If the USPS accepted the proposed change order, it would pay the additional cost resulting from the change rather than recalculate the lease to reflect the increased cost of the building. If the USPS rejected the change order, then the change that it had requested would not be made.

In 1997, defendant and plaintiffs agreed to end their business ventures and divide their jointly held assets between them. As part of that agreement, plaintiffs received the sole rights to some of the land and a number of buildings that the parties had co-owned. Defendant received the sole rights to the balance of the land and a number of buildings that the USPS had agreed to lease. However, when the agreement became effective, the buildings that defendant received had not been completed. The parties' contract addressed that by providing that plaintiffs would "build post offices in Turner, Corvallis, and Toledo, Oregon for [defendant] at a price equal to [*plaintiffs'*] *cost* including attributed liability insurance costs." (Emphasis added.) A handwritten note in the margin of the contract indicates that liability insurance

costs were to be the sole item of overhead and profit paid to plaintiffs for work on the buildings. Both parties initialed the note.

After the parties divided their jointly owned assets, plaintiffs completed the three buildings. However, plaintiffs spent more to build the buildings than the total of the estimates on which the bid amounts were based, insurance expenses, and the amount paid by the USPS for approved change orders. Defendant refused to pay plaintiffs for costs that exceeded that total. In response, plaintiffs brought this breach of contract action, alleging that it had cost $95,366.08 more to construct the buildings than defendant had paid for them and seeking a judgment for that amount plus prejudgment interest. Defendant, in turn, alleged various counterclaims against plaintiffs. In answer to those counterclaims, plaintiffs alleged, among other things, that defendant's claims were time barred because they actually were tort claims that were subject to a two-year statute of limitation rather than the six-year statute that applies to contract claims.

At trial, defendant took the position that the term "[plaintiff's] cost" was ambiguous and that the circumstances underlying the formation of the contract revealed that the term meant the cost estimates on which the bids were based plus approved change orders. After defendant had presented all of his evidence on the meaning of the term "[plaintiffs'] cost" and on most of his counterclaims, plaintiffs moved for a directed verdict on their claim against defendant, arguing that the term "[plaintiffs'] cost" in the parties' contract could be interpreted only to mean the expenses that plaintiffs had incurred to construct the buildings.[1] Plaintiffs also moved for a directed verdict on defendant's counterclaims, arguing that

---

[1] Strictly speaking, "there can be no directed verdict in a case tried to the court," *Dillard and Dillard*, 179 Or App 24, 28-29 n 2, 39 P3d 230, *rev den*, 334 Or 491 (2002), and there is no plaintiff's equivalent for a motion under ORCP 54 B. By their motion, plaintiffs sought to tell the court that they were entitled to prevail as a matter of law. We cannot speculate as to whether plaintiffs brought this motion in order to preserve their legal argument for appeal, as required by *Peiffer v. Hoyt*, 186 Or App 485, 63 P3d 1273 (2003), *aff'd*, 339 Or 649, 125 P3d 734 (2005). However, we note that plaintiffs no longer must make such a motion as a result of the Supreme Court's decision in *Peiffer. See Peiffer v. Hoyt*, 339 Or 649, 659, 125 P3d 734 (2005).

defendant had not proved his damages and that his claims were time barred. The court granted plaintiffs' motion for a directed verdict on plaintiffs' contract claim and most of defendant's counterclaims. In making that ruling, the court concluded that the term "[plaintiffs'] cost" was unambiguous and that the evidence presented by defendant did not render the term ambiguous. The trial court concluded that "[plaintiffs'] cost" meant all of the expenses that plaintiffs had incurred in constructing the buildings. The court also concluded that, even if the term "[plaintiffs'] cost" were ambiguous, defendant was nevertheless responsible for submitting change orders to the USPS and had failed to do so. After receiving additional evidence on defendant's remaining counterclaim, the court determined that plaintiffs were liable to defendant for $8,000 on that counterclaim and that defendant was liable to plaintiffs for $95,366.08 plus prejudgment interest. The court entered judgment accordingly.

■■    On appeal, defendant first assigns error to the trial court's grant of plaintiffs' motion for directed verdict on plaintiffs' breach of contract claim. Specifically, defendant argues that the court erred in concluding that the term "[plaintiff's] cost" is unambiguous. As at trial, defendant's theory on appeal is that the meaning of the term "[plaintiffs'] cost" as the parties used it in their agreement is ambiguous in light of the circumstances underlying the formation of the contract.

    "A contract provision is ambiguous if it has no definite significance or if it is capable of more than one sensible and reasonable interpretation[.]" *Deerfield Commodities v. Nerco, Inc.*, 72 Or App 305, 317, 696 P2d 1096, *rev den*, 299 Or 314 (1985). Although neither party addresses it, we first must examine the threshold issue whether a trial court can consider the circumstances underlying the formation of a contract to determine whether the terms of the contract are ambiguous.

    ORS 41.740 codifies the parol evidence rule and, in relevant part, provides:

> "When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest,

no evidence of the terms of the agreement, other than the contents of the writing, except where a mistake or imperfection of the writing is put in issue by the pleadings or where the validity of agreement is the fact in dispute. *However, this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in ORS 42.220, or to explain an ambiguity, intrinsic or extrinsic, or to establish illegality or fraud."*

(Emphasis added.) Thus, there are three exceptions to the general rule prohibiting a court from considering extrinsic evidence to establish the terms of a written agreement. The rule does not exclude evidence of (1) "the circumstances under which the agreement was made, or to which it relates, as defined in ORS 42.220"; (2) "to explain an ambiguity, intrinsic or extrinsic"; or (3) "to establish illegality or fraud." ORS 41.740. For purposes of this case, it is the first exception that is at issue.

ORS 42.220 provides:

"In construing an instrument, the circumstances under which it was made, including the situation of the subject and the parties, may be shown so that the judge is placed in the position of those whose language the judge is interpreting."

In *Abercrombie v. Hayden Corp.*, 320 Or 279, 292, 883 P2d 845 (1994), the Supreme Court interpreted ORS 42.220 to allow a trial court to "consider parol and other extrinsic evidence to determine whether the terms of an agreement are ambiguous." *See also Criterion Interests, Inc. v. The Deschutes Club*, 136 Or App 239, 243 n 2, 902 P2d 110, *adh'd to as modified on recons*, 137 Or App 312, 903 P2d 421 (1995), *rev den*, 322 Or 489 (1996) (concluding that *Abercrombie* resolved the issue whether underlying circumstances may be considered in order to determine whether a term is ambiguous). We have explained that

"*Abercrombie* does not stand for the proposition that any extrinsic evidence may be considered in determining whether a term is ambiguous. Rather, *Abercrombie*'s reliance on ORS 42.220 as support for its statement makes clear that the extrinsic evidence that may be considered is limited to the circumstances under which the agreement was made."

*City of Eugene v. Monaco*, 171 Or App 681, 687, 17 P3d 544 (2000), *rev den*, 332 Or 240 (2001).

■ Thus, it would seem clear that ORS 42.220, as interpreted by the Supreme Court in *Abercrombie* and consistently applied by this court, allows a trial court to consider evidence of the circumstances underlying the formation of a contract in its analysis of whether a contract term is ambiguous. However, the Supreme Court's decision in *Yogman v. Parrott*, 325 Or 358, 937 P2d 1019 (1997), muddies the water a bit. In *Yogman*, the Supreme Court described a three-step analysis for the construction of a contractual provision. *Id.* at 361. At the first analytic step, the court considers the text and context of the contractual provision to determine whether the provision is ambiguous. *Id.* If the text and context reveal that the provision is ambiguous, then at the second step, the factfinder considers the "extrinsic evidence of the contracting parties' intent." *Id.* at 363. If the "provision remains ambiguous after the first two steps have been followed, the court relies on appropriate maxims of construction" to determine the provision's meaning. *Id.* at 364. Because the Supreme Court did not discuss *Abercrombie*, ORS 42.220, or the role that evidence of the underlying circumstances plays in the analysis, there has been some question about whether the rule of *Abercrombie* survived *Yogman*. In fact, the United States Court of Appeals for the Ninth Circuit has concluded that *Yogman* implicitly overruled that portion of *Abercrombie* that would allow a trial court to consider evidence of the circumstances underlying the formation of the contract to determine whether a particular contractual provision is ambiguous. *Webb v. National Union Fire Ins. Co. of Pittsburgh*, 207 F3d 579, 581-82 (9th Cir 2000).

We have declined to draw the same conclusion about *Yogman* that the Ninth Circuit did, and we have maintained on at least two occasions that *Abercrombie* is still good law. *City of Eugene*, 171 Or App at 687 n 7; *OTECC v. Co-Gen*, 168 Or App 466, 476 n 8, 7 P3d 594 (2000), *rev den*, 332 Or 137 (2001). However, our conclusions in those cases regarding the continued vitality of the *Abercrombie* rule could be considered *dicta* because in *City of Eugene* the extrinsic evidence on

which the defendant relied was not evidence of the circumstances under which the contract was made and in *OTECC* we indicated that the result in that case would be the same regardless of which Supreme Court case we followed. Thus, the apparent inconsistency between *Yogman* and *Abercrombie* arguably survives. We take this opportunity to resolve conclusively that *Abercrombie* survived *Yogman*.[2]

When viewed properly, the apparent inconsistency between *Yogman* and *Abercrombie* is illusory. In *Yogman*, the court was not presented with evidence of the circumstances underlying the contract at issue and, thus, did not have the opportunity to consider where in its three-step framework such evidence could properly be considered. Consequently, *Yogman*'s silence as to *Abercrombie*, ORS 42.220, and the role of evidence of underlying circumstances is understandable. Furthermore, the court in *Yogman* concluded that the contractual provision at issue was ambiguous based solely on the text and context of the provision. 325 Or at 363. Thus, there was no need for the court to comment on whether a court can consider the circumstances underlying the formation of a contract to determine whether a term is ambiguous.

Where the *Yogman* court did consider extrinsic evidence—at the second level of its analysis after it had already concluded that the provision was ambiguous—it did so in a manner consistent with the second exception to the parol evidence rule explained above. That exception allows the court

---

[2] In *OTECC*, we adhered to *Abercrombie* for three reasons:

"First, if *Abercrombie* is to be disavowed, the Oregon Supreme Court should do the disavowing. The court did not do so—at least not explicitly—in *Yogman* despite *Abercrombie*'s then-recent vintage. Second, the relevant portion of *Abercrombie* appears to be based on ORS 42.220. When the Oregon Supreme Court interprets a statute, that interpretation becomes part of the statute as if it were written into the statute at the time of its enactment. * * * We therefore are particularly reluctant to disregard *Abercrombie*'s conclusion insofar as it reflects the requirements of that statute. Finally, we have followed *Abercrombie* and resolved cases in reliance on it. *See, e.g., Moon v. Moon,* 140 Or App 402, 407, 914 P2d 1133, *rev den* 323 Or 484 (1996); *Criterion Interests, Inc. v. The Deschutes Club,* 136 Or App 239, 245, 902 P2d 110, *on recons* 137 Or App 312, 903 P2d 421 (1995), *rev den* 322 Or 489, 909 P2d 161 (1996)."

168 Or App at 476 n 8 (some citations omitted). In addition to the reasons that we discuss in the text, we rely on those same three factors to reach our conclusion that *Abercrombie* is still good law.

to use extrinsic evidence "to explain an ambiguity, intrinsic or extrinsic." ORS 41.740. That *Yogman* applied only the second exception to the parol evidence rule provided in ORS 41.740 does not render the other two exceptions a dead letter. Thus, nothing in *Yogman* requires the conclusion that that decision overruled *Abercrombie*.

■　　Finally, to the extent that *Abercrombie* interpreted ORS 42.220 (and we concluded in *Criterion Interests*, 136 Or App at 243 n 2, that it did), that interpretation became part of ORS 42.220 "as if it were written into the statute at the time of its enactment." *OTECC*, 168 Or App at 476-77 n 8 (citing *Holcomb v. Sunderland*, 321 Or 99, 105, 894 P2d 457 (1995)). Such an interpretation by the Supreme Court is subject to revision only by the legislature. *State v. King*, 316 Or 437, 445, 852 P2d 190 (1993) (citing *State v. White*, 303 Or 333, 348, 736 P2d 552 (1987)).[3] Based on the silence in *Yogman* as to its effect on *Abercrombie* and the fact that the legislature has not amended ORS 42.220 since the court's interpretation of it in *Abercrombie*, we conclude that ORS 42.220 and ORS 41.740 still allow a trial court to consider the circumstances underlying the formation of a contract to determine whether a particular contractual provision is ambiguous.

■　　Thus, to determine whether a contractual provision is ambiguous, the trial court can properly consider the text of the provision in the context of the agreement as a whole and in light of the circumstances underlying the formation of the contract. That conclusion affects our standard of review. Generally, on appeal from the grant of a motion for directed verdict (or, more accurately in this case, a motion for judgment as a matter of law, *see* 204 Or App at 312 n 1), we review the trial court's grant of the directed verdict for legal error, considering the evidence in the light most favorable to the party against whom the verdict was entered. *Mauri v. Smith*, 324 Or 476, 479, 929 P2d 307 (1996). Whether a contract is ambiguous is a question of law. *Yogman*, 325 Or at 361. However, where the court must determine whether a contractual

---

[3] Admittedly, the Supreme Court has not always strictly adhered to its statement in *King*. *See Holcomb*, 321 Or 99, 105, 894 P2d 457 (1995); *see also* Jack L. Landau, *Some Observations About Statutory Construction in Oregon*, 32 Willamette L Rev 1, 20-23 (1996) (discussing *Holcomb*).

term is ambiguous, and the parties have presented evidence of the circumstances underlying the formation of the contract, the court must first find the historical facts before resolving the legal question whether the term is ambiguous.[4]

■■   The proper analysis in such a case is not unlike the analysis of whether the terms of a contract are integrated. As with the question whether a contractual term is ambiguous, the question whether the terms of a contract are integrated presents a legal question. In *Wescold, Inc. v. Logan International, Ltd*, 120 Or App 512, 519-20, 852 P2d 960 (1993), *rev den*, 318 Or 459 (1994), we explained the proper analysis that a court must follow in resolving the latter question, and the appropriate standard of appellate review:

> "[D]eciding whether terms of a contract are integrated in a writing involves two steps. First, the court must consider all the relevant circumstances to resolve preliminary issues of historical fact. Simply put, the court must decide what happened. * * *. We review those findings for any evidence to support them. * * *. Second, the court determines the legal effects of those facts. We review that determination as a legal conclusion."

(Internal citations omitted.)

Nor is the appropriate analysis in this case unlike that at issue in *Ball v. Gladden*, 250 Or 485, 443 P2d 621 (1968). There, the trial court resolved the legal issue of whether the defendant's confession was voluntary. On appeal, the Supreme Court recognized that, in order to resolve that legal issue, the trial court necessarily had to make findings of historical fact. *Id*. at 487. The Supreme Court explained that,

> "[i]f findings are not made on all such facts, and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the ultimate [legal] conclusion."

*Id*.

---

[4] That conclusion is consistent with the language of ORS 42.220, which contemplates placing the judge "in the position of those whose language the judge is interpreting."

Here, the trial court was charged with drawing a legal conclusion about whether the disputed contractual term was ambiguous and was presented with evidence of the circumstances underlying the formation of the contract that, as explained below, suggested that the term was reasonably capable of more than one interpretation. Nonetheless, the court concluded that the term was unambiguous. That conclusion is pregnant with implicit factual findings, and, as discussed below, an implicit credibility determination. Again, we review the court's explicit and implicit findings of fact for any evidence in the record to support them, and the legal consequences of those facts for legal error. *Cf. Wescold*, 120 Or App at 519-20.

As noted above, defendant's primary thesis on appeal is that the term "[plaintiffs'] cost" is ambiguous and, properly construed, means the amounts that the parties used to prepare their bids to the USPS in order to win the contract to build the relevant post offices. Those bid amounts, defendant argues, consist of a specific dollar amount, the cost of certain materials, and the cost of USPS-approved change orders.

We start with the text and context. "Cost" is an inherently flexible term. Nonetheless, the context of the term in this contract helps us understand what the parties intended the term to mean. Handwritten beneath the paragraph that includes the provision in question, initialed by both parties, and connected by a hand-drawn arrow to the typewritten provision that the price includes "attributed liability insurance costs" is the phrase "sole cost item of OH&P." In contracting parlance, "OH&P" stands for overhead and profit. Thus, the parties agreed that the liability insurance costs were the sole item of overhead and profit. That the parties chose to articulate the sole item of overhead and profit points toward the conclusion that "[plaintiffs'] cost," as used in this contract, does not include other items of overhead and profit.

With that in mind, we consider the evidence in the record of the underlying circumstances. Defendant points to the parties' past dealings, prior drafts of the agreement, and a statement that he purportedly made to plaintiffs before the

parties signed their contract as the circumstances underlying the formation of the contract. We begin with the evidence of the parties' prior dealings. Evidence of a prior course of dealing is evidence of the circumstances underlying a contract. *See Stanfield v. Arnwine*, 102 Or 289, 299, 202 P 559 (1921) (holding that trial court erred by not allowing the plaintiff to introduce evidence of prior dealings with the defendant). Defendant argues that the parties' prior dealings establish that the term "[plaintiffs'] cost" is ambiguous. In support of his argument, defendant first points out that, during the parties' co-ownership of the properties, plaintiffs or an employee of plaintiffs submitted all change orders to the USPS. Although the fact that plaintiffs had in the past submitted the change orders is a circumstance that the court could consider in construing the parties' contract, that fact does not speak to the meaning of the term cost. Rather, it indicates that, if plaintiffs were responsible for submitting change orders to the USPS, then defendant might have a claim for breach of contract if plaintiffs failed to submit the appropriate change orders. We consider that possibility below. However, whether the USPS paid defendant for any changes to the buildings does not support the idea that plaintiffs did not incur a cost unless they submitted a change order to the USPS. Whether or not defendant was *paid* for the cost of making a change to a building, plaintiffs would still have incurred costs in making the change. The parties' past practice on the submission of change orders does not reasonably support an interpretation of "[plaintiffs'] cost" to mean what defendant contends that it means.

Defendant also relies on prior drafts of the parties' agreement.[5] Those drafts provide, sequentially, that plaintiffs were to build the buildings "for costs plus 8%"; "for costs not to exceed the bid amount"; and "per price to be agreed upon." Neither party addresses whether the parties' precontract negotiations constitute circumstances underlying the formation of the contract under ORS 42.220, but it appears to us that they do. In *Anderson v. Divito*, 138 Or App 272, 279, 908 P2d 315 (1995), we considered the parties' precontract

---

[5] We note that plaintiffs' attorney prepared all of the drafts of the parties' contract. The record does not indicate which party proposed the various terms.

negotiations in order to determine whether the circumstances underlying the formation of the contract demonstrated that the contract was ambiguous.

█    Here, the prior drafts are of no help to defendant. Rather than supporting defendant's argument, the different proposals support plaintiffs' contention that the contract is unambiguous. The parties first rejected the idea that plaintiffs would construct the buildings for the amount that it actually cost to construct them plus eight percent of that amount as overhead and profit. Next, the parties rejected the idea that plaintiffs would be paid the actual costs so long as that amount did not exceed the bid amount. Lastly, the parties rejected the idea that they would determine the appropriate payment later. Thus, rather than supporting an alternative construction of the term "[plaintiffs'] costs," the prior drafts of the agreement support plaintiffs' contention that the term unambiguously refers to plaintiffs' actual costs. Because the prior drafts of the agreement are consistent with the trial court's legal conclusion that the contract was unambiguous, we presume that the trial court implicitly found that the prior drafts submitted into evidence accurately reflected the parties' negotiations.

Defendant also argues that his statement to plaintiffs before they signed the contract that " '[plaintiffs'] cost' refers to the bids," and plaintiffs' silence in response to that statement, render the meaning of "[plaintiffs'] cost" ambiguous. Defendant's statement and plaintiffs' silence in response to it are circumstances underlying the formation of the contract. *See Stanfield*, 102 Or at 299 ("If, as part of the transaction in explaining the term, one of the parties had made an admission as to [what a term meant,] that would be admissible against him."). Defendant identifies the bids as consisting of the specific dollar amounts that the parties used to prepare the bid to the USPS, the cost of certain materials, and USPS-approved change orders. In essence, defendant's position is that, if the USPS approved change orders for the three post offices, plaintiffs would be entitled, under the agreement, to receive the amounts paid by the USPS under the change orders.

Of the circumstances underlying the formation of the contract, only defendant's purported statement possesses even the slimmest potential to render the contract ambiguous. If defendant had, in fact, said to plaintiffs, " '[C]ost' refers to the bids," and plaintiffs had said nothing in response, then that circumstance could have been enough to create an ambiguity as to the meaning of the term "[plaintiffs'] cost." That is, such a circumstance might make the term subject to more than one reasonable interpretation. However, as we explained above, we must presume that the trial court found the historical facts in a manner consistent with its legal conclusion that the term is unambiguous. Thus, we presume that the trial court made an implicit credibility finding as to defendant's testimony and that it implicitly found, as historical fact, that defendant did not make such a statement. *Cf. State v. Parker*, 113 Or App 513, 517, 835 P2d 918, *aff'd in part and rev'd in part on other grounds*, 317 Or 225, 855 P2d 636 (1993) (presuming that, given the trial court's legal conclusion, the trial court did not believe uncontroverted evidence and explaining that the trial court, as factfinder, could do that).

■  With the facts as implicitly found by the trial court in mind, we conclude that the trial court did not err in concluding that, as a matter of law, the contractual term "[plaintiffs'] cost" is unambiguous. Although the term "cost" ordinarily may be used in a variety of ways, the context of the other provisions of the contract and the prior drafts of the parties' contract make clear that the parties intended the term to mean plaintiffs' actual costs. Furthermore, because the trial court can be understood not to have credited defendant's testimony that he told plaintiffs that " 'costs' refers to bids," there is no evidence in the record to suggest any other reasonable interpretation. The trial court did not err in granting plaintiffs' motion on plaintiffs' breach of contract claim.

We turn to defendant's assignment of error on the court's ruling on defendant's counterclaims. Defendant alleged that plaintiffs had breached their contract with him with regard to the Turner and Toledo post offices by, among other things, "failing to manage and track change orders and bill the end purchaser and user of the construction the

change order amounts." Defendant also alleged that it was plaintiffs' responsibility to submit change orders to the USPS, and that plaintiffs had breached that duty. The trial court rejected defendant's counterclaims, stating, "I can't find from this evidence, and would not find, that it was, as a matter of contract law, it was anybody's obligation other than the owner's obligation to get change orders approved." The trial court explicitly based its conclusion on a rider to the lease agreement with the USPS.

On appeal, defendant argues that, in the parties' past dealings, plaintiffs had submitted the change orders to the USPS. Plaintiffs do not dispute that plaintiffs submitted the change orders to the USPS during the period of the parties' co-ownership of the properties. Plaintiffs argue, however, that the court correctly interpreted the lease agreement with the USPS to require defendant to submit change orders to the USPS. We review the trial court's disposition of defendant's counterclaims as we would the grant of a motion for involuntary dismissal under ORCP 54 B(2) for insufficient evidence. *Dillard and Dillard*, 179 Or App 24, 29 n 2, 39 P3d 230 (2002). We review such a ruling for legal error, inquiring whether the evidence in the trial record establishes a *prima facie* case. *Thorson v. Dept. of Justice*, 171 Or App 704, 709, 15 P3d 1005 (2000) (citing *Ranger Ins. Co. v. Globe Seed & Feed Co., Inc.*, 125 Or App 321, 327, 865 P2d 451 (1993), *rev den*, 318 Or 458 (1994), and *Scholes v. Sipco Services & Marine, Inc.*, 103 Or App 503, 506, 798 P2d 694 (1990)).

To succeed on his counterclaims, defendant had to establish that plaintiffs had a contractual obligation to submit change orders to the USPS on the Toledo and Turner post offices. Nothing in the text or the context of the contract between the parties under which they divided their joint assets speaks to such a duty. As discussed above, it is undisputed that plaintiffs submitted change orders to the USPS as a part of the parties' prior joint ventures. However, when plaintiffs did so, plaintiffs and defendant were co-owners of the properties involved. By virtue of the agreement between the parties, effective January 1, 1997, defendant became the sole owner of the limited liability companies (LLCs) that owned the Toledo and Turner post offices.

That undisputed fact is important because the evidence in the record establishes that the lessor of the post office was responsible for submitting change orders to the USPS. A construction rider to the lease agreements between the USPS and the LLCs that owned the Toledo and Turner post offices provides:

> "Unless otherwise specified, no construction activity at the site may be commenced until the Lessor has received written notice from the [USPS's] contracting officer of approval of final drawings and specifications. Changes or modifications which may be required during construction must be approved in writing by the [USPS's] contracting officer prior to proceeding with such changes."

Roche, the USPS project manager for the Toledo and Turner post offices, testified that only the lessor of the property—in this case the LLCs owned by defendant—could "officially" make change order requests. Roche stated that, if the USPS received change order requests from a contractor, the USPS would "have to, in turn, send those to the owner because we do not have a contract with the builder. In other words, any correspondence has to come through the owner to us."

Because the owner of the post office property is responsible for submitting change order requests to the USPS, it is unremarkable that, on the previous projects where plaintiffs were co-owners with defendant of the property, plaintiffs had submitted such requests directly. Thus, the prior practice of the parties does not establish that plaintiffs had an obligation to submit the change orders under the parties' contract. Because there is no evidence in the record to establish that plaintiffs had a contractual obligation to defendant to submit change orders to the USPS on the Toledo and Turner post offices, the trial court did not err in granting plaintiffs' motion for dismissal of defendant's counterclaims regarding those post offices.

Having resolved defendant's assignments of error, we turn to plaintiffs' cross-assignment of error. Plaintiffs cross-assign error to, but did not cross-appeal from, the court's ruling that defendant timely filed his counterclaims. In response, defendant argues that, because plaintiffs' cross-assignment of error seeks to modify the trial court's $8,000

judgment for defendant on one of defendant's counterclaims, it is not a proper cross-assignment under ORAP 5.57(2). We agree and reject plaintiffs' cross-assignment of error without further discussion. *See Samuel v. King*, 186 Or App 684, 690-91, 64 P3d 1206, *rev den*, 335 Or 443 (2003) (holding that a respondent's assignment of error that would yield relief different from that awarded by trial court judgment was not properly before appellate court unless raised by cross-appeal).

Affirmed.