Argued and submitted July 23, 2008, reversed and remanded on appeal;
cross-appeal dismissed as moot June 17, 2009

SHOGUN'S GALLERY, INC.,
an Oregon corporation,
*Plaintiff-Respondent*
*Cross-Appellant,*

*v.*

Doris MERRILL,
an individual;
Charles Merrill,
an individual;
Chris Pagni,
an individual;
Rosmond Langberg,
an individual;
and Raymond Langberg,
an individual,
*Defendants-Appellants*
*Cross-Respondents.*

Multnomah County Circuit Court
050302855; A131915

210 P3d 920

Gary Roberts argued the cause for appellants - cross-respondents. With him on the briefs was Schwabe, Williamson & Wyatt, P.C.

Brian R. Talcott argued the cause for respondent - cross-appellant. With him on the briefs was Dunn Carney Allen Higgins & Tongue LLP.

Before Schuman, Presiding Judge, and Ortega, Judge, and Sercombe, Judge.

ORTEGA, J.

## ORTEGA, J.

Defendants appeal from a judgment that reformed a commercial lease by modifying a rent escalation provision and, alternatively, declared the provision inapplicable for the first year of the lease. Defendants, the landlords, assign error to both aspects of that judgment. Plaintiff, the tenant, cross-appeals, contending that the court should have entered the declaratory judgment as the operative judgment or, alternatively, allowed a different amount of rent under the reformed lease. Because we conclude that the trial court erred in its construction and reformation of the lease, we reverse and remand.

The facts are largely undisputed. Defendants own commercial property, the Quality Pie Building, on Northwest 23rd Avenue in Portland. They offered to lease the building below the market rate because it required major improvements, which defendants intended would be made by the tenant. Plaintiff, an antique gallery, agreed to lease the property. Under the lease, plaintiff undertook and bore the expense of substantial renovations and improvements. To amortize the expense, plaintiff negotiated a 15-year lease with two five-year options.

Under the lease, the rent increases annually. Pivotal to the parties' dispute is Section 4.3:

"CPI Adjustment. Beginning December 1, 2003, the monthly rental stated in Section 4.1 shall be adjusted effective on the first day of December of each year during the term of this Lease. The amount of the adjustment shall be the greater of the following amounts:

"(a) The current monthly rental multiplied by the percentage increase, if any, as shown by the county tax assessor, of the land portion only of the premises (all of Lots 1 and 2) in the current tax year compared to the prior tax year; or

"(b) The current monthly rental multiplied by the percentage increase, if any, in the preceding year as shown by the Consumer Price Index published by the United States Bureau of Labor Statistics. * * *

"Provided, that the amount of the monthly rental shall never be less than the amount thereof for the preceding year.

"(c) Tenant shall have the right to petition the Board of Equalization, at Tenant's expense, for an adjustment of the property tax assessment."

The same rent escalation provision had appeared in each draft of the lease that the parties discussed during their negotiations. Although King, one of plaintiff's principals, expressed concern about potential rent increases, the provision was never changed.

Before executing the lease, plaintiff's principals met with Merrill, who manages properties on behalf of defendants, and Gillespie, the real estate broker. At some point in the meeting, King asked to eliminate either subsection (a) or subsection (b) of Section 4.3; in response, Merrill began to walk out, stating that the building could go back on the market.

The parties discussed the purpose and some possible effects of Section 4.3. King asked how much the rent could increase under that section, and Merrill responded that "he didn't know. He * * * could not say." Merrill stated that Section 4.3(a) was an "inflationary increase," and King believed that they agreed that rent was to keep pace with inflation and increases in property value.

When King expressed concern that the improvements would increase the tax assessment of the building, Gillespie said that any rent increase under Section 4.3(a) would be based on an increase in land value only, not improvements to the building. Gillespie also said that he thought that Measure 50 could limit annual property tax increases to three percent, and Merrill said nothing to contradict Gillespie's statement, although, at some point, Merrill said that he did not know how much the land value could increase.[1] Although King understood that Merrill and Gillespie

---

[1] Under Measure 50,

"[a] property's maximum assessed value may increase by no more than three percent per year. Or Const, Art XI, § 11(1)(b). The property is taxed on the lesser of the maximum assessed value or the real market value. *See* Or Const,

had not given uniform answers regarding the possible effects of Measure 50, King did not look further into the issue.

The parties did not discuss whether improvements could trigger a new appraisal of the property, how the county tax assessor would determine the land value, or whether the assessor would base tax statements on an actual increase in land value or engage in "catch-up appraisals." In fact, according to an appraiser from the assessor's office, Measure 50 does not limit the calculation of the real market value of the land. Although King did not specifically understand what information from the assessor would be used, he "assumed" that the calculation of a rent increase under Section 4.3(a) "had something to do with the tax statement that we would receive showing how much the increase in taxes were on the property on a yearly basis."

The parties entered into the lease, and plaintiff completed renovations in March 2003, spending about $292,000 on improvements to the building. Because of the changes to the property, the assessor's office reappraised it in 2003.

The assessor's office had last physically appraised the property in 1996. In the intervening years, the assessor's office had determined the market value of the land based on a mass appraisal technique that applies overall trends based on sales of commercial properties. A senior appraisal analyst from the assessor's office explained that a trended increase "in no way compares last year's sale prices to this year's sale prices. That's not part of the assessor's function. It is literally a comparison of last year's assessed value to this year's sale prices." Using that "trended" approach in 2002, the assessor's office had determined that the land value was $491,000.

Art XI, § 11(1)(a) (establishing 'maximum assessed value' as upper limit on assessment) (emphasis added); Or Const, Art XI, § 11(1)(f) ('Each property's assessed value shall not exceed the property's real market value.'). Thus, if the real market value of property exceeds the property's maximum assessed value, then property tax is levied based on the maximum assessed value, not the real market value, of the property."

*Flavorland Foods v. Washington County Assessor*, 334 Or 562, 565, 54 P3d 582 (2002); *see also id.* at 564-65 (discussing the history of Measure 50).

In the 2003 appraisal, however, the appraiser concluded that the market value of the land alone—without reference to the value of any structure on the land—was $700,000, an increase of 42.6 percent from 2002. Under the heading of "market values," the 2003 property tax statement indicates that the "land" value was $700,000 for "this year" and $491,000 for "last year." As King acknowledged, nothing else on the tax statement refers to the value of the land alone.

The appraiser determined that value for the land without reference to the structures on the property. Without the improvements, however, the assessor's office most likely would not have physically appraised the property but instead would have applied a trended increase of four percent over the 2002 value. Although she had not appraised the property in 2002 and could give no opinion of the value of the land in that year, the appraiser "kn[e]w of no market circumstances that would have caused this property to increase in value by 42 or 43 percent in a single year." Nevertheless, $491,000 was the assessor's statement of the land's market value for 2002. The assessor's office can provide information about year-to-year increases in the market value of a piece of property as shown in the county's records, but not the "actual real market value increases for properties" from year to year.

The size of the increase in the land value contained in the property tax statement surprised the parties. Even Merrill felt that the increase was "horrendous" and that the actual increase in value of the properties in that area was closer to four percent than 42 percent. In King's view, a 42 percent increase was not consistent with inflation.

After unsuccessful efforts to change the tax assessment, plaintiff sued defendants. Plaintiff sought a declaratory judgment that Section 4.3(a) of the lease assumed only a four percent trended increase in land value for 2002 to 2003; that the assessor had supplied no information concerning the actual increase in land value for that year, so all increases should be based on the Consumer Price Index (CPI) instead; or that all increases under Section 4.3(a) were limited to four percent. Plaintiff also sought reformation of Section 4.3(a) to increase rent to "[t]he current monthly rental multiplied by

the percentage of the trended increase, if any, as shown by the county tax assessor, of the land portion only of the premises (all of Lots 1 and 2) in the current tax year compared to the prior tax year."[2] Plaintiff asserted additional claims for breach of contract and misrepresentation.

The case was tried to the court. After the close of plaintiff's evidence, the court dismissed the breach of contract and misrepresentation claims, and that ruling is not challenged on appeal. The court found that neither party entered the lease misrepresenting or misunderstanding the lease's terms. Rather, the court found that "[t]he big mistake of fact here was mutual, and it's both sides not really understanding that land value assessments make perfect sense," but neither party "understood that the starting point with the County was an undervalued statement."

During closing arguments, the trial court informed the parties that it would not find the lease ambiguous. After closing arguments, the court made oral findings and ruled in favor of plaintiff. The court explained:

"There were two stated reasons by the part[ies] as to their intent for [Section 4.3]. The first, and probably the main reason why this clause was part of the lease, was to protect [defendants] from the year-to-year inflation on either economic inflation by the CPI or the—or land inflation on a year-to-year basis.

"It was also the intent of the parties that the improvements that [plaintiff] made to the property were not going to be a cause of increase in the rent. In fact, the improvements did, in a backhand way, cause an increase in the rent in that the improvements led to permits; the permit process through the City is turned over to the County. That led to [a

---

[2] In its first amended complaint, plaintiff alleged that the parties had agreed that

"1) any increase in [the] rental amount under Section 4.3(a) would be based on information from the Assessor that reflected the actual increase in land value of the Property in the year in question, 2) that Measure 50 would limit the possible increase in the real market value of the land portion only of the Property as shown by the Assessor to approximately 3%, * * * and 3) that only one of the two provisions of Section 4.3(a) would effectively apply in any given year, and not both."

On appeal, plaintiff has abandoned the theory that the parties agreed that Measure 50 would limit rent increases.

reappraisal] of the property, including a true real value assessment of the land. The land was clearly undervalued for a number of years prior to entering the lease, finding it was not the intent of the parties for [plaintiff] to make up for years of undervaluation of the property in the first year of their lease with [defendants].

"* * * * *

"I think both sides were very clear about this. The evidence really is not in dispute about this. * * * It was a mistake of fact. There were antecedent agreements regarding the purpose of the increase in rent, and the fact that the improvements were not to cause an increase in rent."

The trial court rejected the theory that plaintiff had been grossly negligent, finding that plaintiff could not have easily discovered the mistake at issue.

The trial court later entered a judgment providing that Section 4.3(a) would be reformed so that the rent increase would be based on

"[t]he current monthly rental multiplied by the percentage increase, if any, in the real market value of the land portion only of the premises (all of Lots 1 and 2) as shown by the annual county property tax statement for the premises, in the current year compared to the prior tax year; provided, however, that the rent increase effective December 1, 2003, shall be ten percent (10%). Thereafter, Section 4.3 of the lease shall remain in place with no limitation on the amount of the annual rent increase."

The judgment further provides that, in the alternative,

"the court declares that, because no information from the county tax assessor demonstrates the actual land value increase from 2002 to 2003, Section 4.3(a) of the lease provides no basis for a rent increase effective December 1, 2003. Therefore, the formula based on the consumer price index, as set forth in Section 4.3(b) of the lease, applies, requiring a two percent (2%) rent increase effective December 1, 2003. In subsequent years, both Section 4.3(a) and 4.3(b) shall remain in place. If there is no appeal or if the court's judgment reforming the contract is sustained on appeal, this paragraph of the judgment shall be of no force or effect."[3]

---

[3] We express no opinion of the propriety of awarding alternative relief in that way.

Defendants appeal. Plaintiff cross-appeals, contending that the trial court should have entered the declaratory judgment as the operative judgment or, alternatively, reformed the lease to increase rent by a lesser amount. We conclude that the lease unambiguously allowed an increase based on the assessor's statement of the land value and that the parties did not have an antecedent agreement to which the lease could be reformed. Accordingly, we reverse without reaching plaintiff's cross-appeal.

■ We begin by construing the rent escalation clause in Section 4.3(a), which provides for a rent adjustment equal to "[t]he current monthly rental multiplied by the percentage increase, if any, as shown by the county tax assessor, of the land portion only of the premises (all of Lots 1 and 2) in the current tax year compared to the prior tax year." To interpret a contractual provision, we first examine the text of the disputed provision in context; if the text is clear, the analysis ends there. *Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997). When a provision can reasonably be interpreted in more than one way, it is ambiguous. *Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 313, 129 P3d 773, *rev den*, 341 Or 366 (2006). To determine whether a provision is ambiguous, the trial court may consider the text in light of the circumstances underlying the formation of the contract. *Id.* at 317. However, "[e]vidence of the circumstances under which an agreement is made that is indicative of the parties' intent may only affect the interpretation of the agreement where there is language in the agreement that is susceptible to being construed to carry out that intent." *Criterion Interests, Inc. v. The Deschutes Club*, 136 Or App 239, 246, 902 P2d 110, *adh'd to as modified on recons*, 137 Or App 312, 903 P2d 421 (1995), *rev den*, 322 Or 389 (1996).

■■ When, after being presented with evidence of the circumstances of contract formation, the trial court concludes that a disputed term is unambiguous, "[t]hat conclusion is pregnant with implicit factual findings," which we review for any evidence. *Batzer Construction, Inc.*, 204 Or App at 319. We review the legal consequences of the facts for legal error. *Id.*

■ Defendants contend that Section 4.3 unambiguously requires rent increases based on the assessor's statement of the land value. They argue that the trial court erred in declaring that it would omit Section 4.3(a) of the lease for the first year. In defendants' view, the court did not interpret the lease, which unambiguously requires a rent increase based on the change in the assessor's statement of the land value; rather, defendants contend, the court "rewrote [the lease] in order to create what it believed was a fair outcome."

Plaintiff responds that Section 4.3(a) unambiguously refers to an inflationary increase in the value of land from one year to the next and excludes an increase based on a reappraisal of the property. According to plaintiff, the trial court was correct to omit Section 4.3(a) for the year in question because "nothing on the property tax statement * * * would allow anyone to make a calculation regarding the actual increase in the value of the property." Alternatively, plaintiff contends, if the lease is ambiguous, the extrinsic evidence shows that the parties intended Section 4.3 to cover inflationary increases and "agree[d] that information from the county tax assessor for purposes of [Section 4.3(a)] would reflect a rise in property values from one year to the next, and not an increase based upon a wholesale reappraisal of the property." We disagree.

The text of the lease, on its face, is not susceptible to plaintiff's interpretation. Section 4.3(a) unambiguously refers to calculating the rent increase using a specific method: the percentage increase shown on the property tax statement from the county tax assessor. Neither party contends that the lease refers to something other than the property tax statement or to something on that statement other than the market value of the land. Although plaintiff argues that Section 4.3(a) requires an "actual" increase in land value, the text of the lease simply calls for an increase using the land value "as shown by the county tax assessor." Nothing in the lease requires that the change shown on the property tax statement be an accurate reflection of changes in market value or requires the assessor to measure actual inflation. To reach a contrary result would require the court to omit the requirement that the rent increase be based on

the land value "as shown by the county tax assessor" or to insert text limiting the use of the assessor's statement. We cannot do so. ORS 42.230; *McKay's Market of Coos Bay v. Pickett*, 212 Or App 7, 13, 157 P3d 291 (2007). The text of Section 4.3(a) unambiguously supports defendants' interpretation of the lease.

Nor does the extrinsic evidence of the circumstances of contract formation render Section 4.3(a) ambiguous. As noted, the trial court did not find Section 4.3(a) ambiguous, but it declared that, for the first year of the lease only, it would omit that provision "because of the undervalued land value," which it characterized as a mistake of fact. We understand the trial court to have found that the parties were mistaken about the accuracy of the assessor's statement of the land value in 2002 and that the parties were surprised by the numbers in the 2003 property tax statement. The court declared that Section 4.3(a) would not apply for the first year of the lease but would "remain in place" for later years, apparently meaning that increases in later years could be based on the assessor's statement of the land value.

However, the parties' surprise about the value indicated by the appraisal and used to calculate the rent increase in 2003 does not suggest an alternative, plausible reading of how the calculation called for in Section 4.3(a) was meant to be performed. Plaintiff contends that the parties intended Section 4.3 to result in inflationary increases, meaning "inflationary increases as reflected by the tax assessor (whether by trend or otherwise), as opposed to an increase based on the wholesale reappraisal of the property." But because nothing in the text of the lease supports that limitation on the use of the assessor's statement of land values, the extrinsic evidence does not render the lease ambiguous. *Criterion Interests, Inc.*, 136 Or App at 245-46 (concluding that, where the text of an easement contained no limitation on the easement's use, extrinsic evidence could not justifying reading such a limitation into the easement).

In any event, the extrinsic evidence does not suggest that the parties understood Section 4.3(a) to include the exception that plaintiff seeks—that is, that the assessor's statement cannot be used if it reflects an increase in land

value greater than an inflationary increase. To the contrary, King testified that the parties did not discuss how the assessor would determine the land value or whether the assessor could engage in "catch-up appraisals." Although the parties agree that the purpose of Section 4.3(a) was to provide for inflationary increases, they also agreed to a method of calculating those increases using the assessor's statement of the land value, without exceptions for unexpectedly large changes in value. Accordingly, the trial court erred by declaring that Section 4.3(a) did not apply for the first year of the lease.

 We next consider whether the lease, though unambiguous, fails to reflect the parties' true agreement. An unambiguous contract that, because of a mistake, fails to reflect the parties' intentions may be reformed.[4] *Hunnell v. Roseburg Resources Co.*, 183 Or App 228, 234, 51 P3d 680, *rev den*, 335 Or 114 (2002). A party seeking reformation must prove, by clear and convincing evidence,

"(1) that there was an antecedent agreement to which the contract can be reformed; (2) that there was a mutual mistake or a unilateral mistake on the part of the party seeking reformation and inequitable conduct on the part of the other party; and (3) that the party seeking reformation was not guilty of gross negligence."

*Jensen v. Miller*, 280 Or 225, 228-29, 570 P2d 375 (1977) (citations omitted). An antecedent agreement need not be so complete as to constitute a contract in itself, but it must be specific enough that the contract in question can be reformed to accurately reflect an omitted term. *Aero Sales, Inc. v. City of Salem*, 200 Or App 194, 202, 114 P3d 510 (2005). We review the record *de novo* but, because the trial court had the opportunity to observe the witnesses' demeanor, give great weight to the trial court's findings. *Jensen*, 280 Or at 227.

 Defendants contend that the trial court erred by reforming the lease because the parties had no antecedent agreement to which the lease could be reformed. In addition,

---

[4] Plaintiff did not seek rescission. *See Interior Elevator Co. v. Limmeroth*, 278 Or 589, 598-99, 565 P2d 1074 (1977) (comparing rescission and reformation).

defendants argue that, although the parties did not anticipate the effect of the rent escalation clause during the first year of the lease, that failure of understanding does not justify reformation of the lease.

Plaintiff responds that the court did not err in reforming the lease. Plaintiff contends that the parties had two antecedent agreements:

"First, they agreed to a rent escalation provision that would operate to increase the rent on an annual basis to account for inflation. Second, they agreed that plaintiff would be able to amortize its investment in the property through much-lower-than-market rent payments and, consequently, that those rent payments would not be impacted by the renovations."

In plaintiff's view, because the 42 percent increase in the land value shown on the property tax statement was greater than actual inflation and because the reappraisal of the land was triggered by plaintiff's renovations, a 42 percent increase in rent violates the parties' agreement.

We conclude that there was no antecedent agreement. Throughout the negotiation process, the parties consistently used the same rent escalation provision. Although they agreed that the purpose of Section 4.3(a) was to protect defendants against inflation, the parties did not reach any agreement to achieve that objective, other than the use of Section 4.3 as it is written. To the extent that they agreed that rent increases under Section 4.3(a) would be based on an increase in the land value, not on improvements to the building, that agreement is reflected in the lease: As employees of the assessor's office explained, the appraisal of land value is based solely on the value of the land, without reference to the improvements. Although the assessor's reappraisal of the land was triggered by plaintiff's improvements, the parties never reached any agreement not to use the assessor's statement of value under such circumstances. Indeed, the parties never even discussed whether improvements could trigger a new appraisal of the property or how the assessor would determine land value. Under the circumstances, we cannot say that the parties reached an antecedent agreement to which Section 4.3(a) could be reformed. Accordingly the trial

court erred by granting reformation. In light of our disposition on appeal, we need not address the cross-appeal.

Reversed and remanded on appeal; cross-appeal dismissed as moot.