Argued and submitted December 14, 2005, judgment vacated and remanded for further proceedings; cross-appeal dismissed as moot September 20, 2005

Rod A. HARRIS,
an individual,
and Harris Soup Company,
an Oregon corporation,
*Appellants - Cross-Respondents,*

*v.*

WARREN FAMILY PROPERTIES, LLC,
an Oregon limited liability corporation,
dba Parkrose Business Center,
*Respondent - Cross-Appellant,*

WARREN FAMILY PROPERTIES, LLC,
*Cross-Appellant,*

*v.*

Jan HARRIS,
*Cross-Respondent.*

0303-02848; A125536

143 P3d 548

John W. Stephens argued the cause for appellants - cross-respondents Rod A. Harris and Harris Soup Company and cross-respondent Jan Harris. With him on the briefs was Esler, Stephens & Buckley.

Stephen Griffith argued the cause for respondent - cross-appellant. With him on the opening brief were Charles F. Adams, Matthew J. Kalmanson, and Stoel Rives LLP.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum,* Judges.

ARMSTRONG, J.

---

* Rosenblum, J., *vice* Ceniceros, S. J.

## ARMSTRONG, J.

Plaintiffs appeal a judgment that denied their requested declaratory relief and awarded damages to defendant on its counterclaim for breach of contract. Defendant cross-appeals the court's failure to award all of the relief that it sought on its counterclaim. Plaintiffs occupied progressively greater amounts of space in defendant landlord's properties under sequential leases dating back without interruption for roughly 13 years. Plaintiffs' action sought a declaration that they had no duty on terminating the final leases and vacating the properties to restore the premises to the condition in which they existed at the commencement dates of earlier leases. Defendant counterclaimed for breach of contract, alleging as damages the cost to restore the premises to their condition when first occupied by plaintiffs.[1] The trial court entered judgment in favor of defendant for damages of about $300,000 and attorney fees of $230,000. We vacate and remand the judgment, and dismiss defendant's cross-appeal as moot.

Undisputed facts provide the context for this case. Defendant Warren Family Properties leases space in a multi-building office park to numerous tenants. Plaintiff The Harris Soup Company (Harris Soup) produces packaged foods, and plaintiff Rod Harris is its president and guarantor of its leases. Harris Soup first executed a lease for space in Building 4 of the office park in 1990 (the 1990 Lease). The parties amended and extended the original 1990 Lease, and then executed successive replacement leases for progressively greater amounts of space in Buildings 3 and 4: one lease in 1995 (the 1995 Lease) and two in 2000 that were coterminous (the 2000 Leases). Over the successive lease terms, Harris Soup made cumulative alterations and trade fixture installations in Buildings 3 and 4 to create a corporate office headquarters, an operations and warehousing center, and a USDA-approved food-preparation facility.

---

[1] Landlord also counterclaimed for holdover rent because plaintiffs left items on the premises beyond the termination date. The judgment includes holdover rent, and plaintiffs do not challenge that portion of the judgment on appeal.

In 2002, Harris Soup exercised rights under the 2000 Leases to terminate the leases, paid required early termination fees, and vacated the premises. On termination, defendant asked Harris Soup to remove all alterations, trade fixtures, and equipment. Harris Soup removed trade fixtures and equipment but refused to remove other alterations made under earlier leases. Plaintiffs admitted liability for the cost to remove alterations made during the term of the 2000 Leases and for damages beyond reasonable wear and tear, but did not undertake any removal or repairs because this dispute arose. Following a bench trial, the court ruled that defendant had established plaintiffs' liability to return the premises to their condition as of plaintiffs' first occupancy.

Plaintiffs argue that the trial court erred in construing the leases to mean that they had an obligation to remove all alterations, whenever made, and to restore the premises to their condition as of the time that plaintiffs first occupied each leased space. The disputed sentence in the 2000 Leases reads:

> "All such alterations shall become part of the Building but Landlord reserves the right to require Tenant to remove the same upon termination of this Lease and restore the Premises to their original condition."

Plaintiffs' thesis on appeal is that the phrase "original condition," when construed in context, can only mean the condition of the premises when the 2000 Leases began. The trial court did not expressly address its construction of the 2000 Leases or the meaning of the phrase "original condition." Because the court did not explain how it construed the leases, plaintiffs frame the error in three forms. First, plaintiffs contend that the court erred if it construed the 2000 Leases to obligate them to remove alterations made to the premises before the execution date of the 2000 Leases, because the 2000 Leases contained no such terms. Second, they contend that the court erred if it construed the removal obligation to derive instead from the 1995 Lease, because defendant failed to exercise its right to require removal of alterations made during the 1995 Lease term when that lease terminated. Finally, they contend that the court erred if it construed the removal obligation to derive from the 1990 Lease, because that lease did not

obligate them to remove alterations. Defendant, in addition to cross-appealing the damages award, argues that the lease terms should be construed in its favor, or that it prevails based on an asserted presumption under Oregon law that a party's removal rights in an earlier lease are implicitly incorporated into successive leases for the same property.

 Our first step is to determine the standard of review based on the underlying nature of the claim for declaratory relief. *L & E Farms v. Leonard*, 170 Or App 528, 532-33, 13 P3d 527 (2000). "Declaratory judgment proceedings seeking the construction of a contract are legal in nature, and the factual determinations of the trier of fact are binding on appeal if there is evidence to support them." *Wadsworth v. WWDM, Ltd.*, 162 Or App 622, 628 n 4, 986 P2d 1197 (1999), *rev den*, 330 Or 71 (2000). We review the construction of a contract, including whether it is ambiguous, as a matter of law. *Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997). Where the construction of a contract may depend on extrinsic evidence, "we review the court's explicit and implicit findings of fact for any evidence in the record to support them, and the legal consequences of those facts for legal error." *Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 319, 129 P3d 773 (2006), *rev den*, 341 Or 366 (2006).

 We present the facts as favorably as possible to defendant, who was the prevailing party at trial. Here, the court stated in its letter ruling that it relied on evidence that plaintiffs had continuous possession over the duration of the sequential leases and gave considerable weight to certain other evidence:

> "(1) Tim Warren and Greg Murphy's discussion during the negotiations of the 2000 lease; (2) Murphy's later request for the cost of the restoration; (3) the discussion between Tim Warren and Mr. Harris in late October 2002; (4) the failed opportunity to respond to Tim Warren's letter of November 7, 2002 * * * by Mr. Harris or Mr. Murphy; and (5) Mr. Harris's request for a bid from Harding on restoration to the original conditions."[2]

---

[2] Neither party requested findings pursuant to ORCP 62 A. We rely on the trial court's findings of fact as implicit in its letter opinion. However, we elaborate below on details of the factual topics to which the trial court alluded only to the extent that we agree that those facts were available to resolve the matter before the court.

The first two aspects of evidence in the trial court's summation, namely, continuing possession and a "discussion during the negotiations of the 2000 lease," occurred before or during contract formation. Based on the timing, that evidence may be evidence of the circumstances of contract formation that bears on the parties' intent and on whether a disputed contract provision is ambiguous. To determine whether a provision is ambiguous, a court generally focuses on analysis of the disputed text and its context, including maxims of textual construction, *Yogman*, 325 Or at 361; however, a court may consider extrinsic evidence of the parties' intent that is "limited to the circumstances under which the agreement was made," *City of Eugene v. Monaco*, 171 Or App 681, 687, 17 P3d 544 (2000), *rev den*, 332 Or 240 (2001) (applying *Abercrombie v. Hayden Corp.*, 320 Or 279, 883 P2d 845 (1994)). *See Batzer*, 204 Or App at 314-17 (harmonizing *Yogman* and *Abercrombie*); *see also* ORS 42.220 (controlling a judge's construction of an instrument). We also adhere to the rule that such extrinsic evidence "may only affect the interpretation * * * when there is language in the agreement that is susceptible to being construed to carry out that intent." *Criterion Interests, Inc. v. The Deschutes Club*, 136 Or App 239, 246, 902 P2d 110 (1995). We thus consider the evidence of plaintiffs' possession and the negotiation of the 2000 Leases in construing the contract but, for reasons that we will explain, we conclude that those facts do not establish that the 2000 Leases are ambiguous or can be construed in defendant's favor.

 The other evidence on which the trial court relied concerns events that occurred in 2002. The extrinsic evidence available to *resolve* a contract ambiguity includes evidence of the circumstances and conduct of the parties during the life of the agreement. *Yogman*, 325 Or at 364 (citing *Tarlow v. Arntson*, 264 Or 294, 300, 505 P2d 338 (1973) (when agreement was ambiguous, court examined what parties did under it)). In contrast, where an agreement is reduced to writing *and there is no ambiguity to be explained*, the writings are "considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing." ORS 41.740 (parol

evidence rule).³ Because we conclude that the written con-
tract provisions are unambiguous, we also conclude that the
parties' conduct in 2002, during the life of the 2000 Leases, is
not evidence of intent that is available to support interpreta-
tion of their agreement.

█ In addition to the areas of evidence that the court
emphasized, we note that the 1990 and the 1995 Leases are
relevant evidence of the circumstances surrounding forma-
tion of the 2000 Leases. "Evidence of a prior course of dealing
is evidence of the circumstances underlying a contract."
*Batzer*, 204 Or App at 320.

Given that background on the application of evi-
dence to contract construction and on the nature of the evi-
dence in this case, the following additional facts from the rec-
ord are material to construction of the 2000 Leases. The 1990
Lease is a standard form commercial lease document created
by defendant (as are the 1995 Lease and the 2000 Leases)
and it contains many defined terms that appear verbatim in
the later leases. Of relevance here, each "Lease" is defined to
be "THIS LEASE AGREEMENT." "Premises" are defined to
be the specific areas leased within a numbered "Building" in
the office park, and are to "be used and occupied for prepara-
tion of packaged food items along with administrative office
and warehouse needs and for no other purpose without prior
written consent." The "Building" consists of the "Premises" at
a certain address in Portland. Each lease has a "Commence-
ment Date" and a "Termination Date," with those terms each
defined to be a date certain.

---

³ As we explained in *Batzer*, 204 Or App at 314, the parol evidence rule allows
three express exceptions for which a court may consider extrinsic evidence: (1) to
establish an ambiguity based on circumstances surrounding formation of the
agreement, (2) to explain an ambiguity, or (3) to show fraud or illegality. Defendant
urges us to interpret ORS 42.250 to require that we consider evidence of the course
of performance under a written contract to establish an ambiguity. ORS 42.250
provides in part that a court should consider evidence that contract terms "have a
* * * peculiar signification and were *used and understood* * * * accordingly."
(Emphasis added.) Defendant's argument that the use of the phrase "used and
understood" in ORS 42.250 must allow for evidence of conduct that follows contract
formation is unpersuasive. In fact, the issue in the case defendant cites, *Bernard v.
First Nat'l. Bank*, 275 Or 145, 157, 550 P2d 1203 (1976), concerned "knowledge at
the time [each borrower] secured his loan," not subsequent conduct.

The parties do not dispute that the 1990 Lease gave Harris Soup the right to install and remove trade fixtures without defendant's consent, required Harris Soup to have defendant's consent to make other alterations, and gave defendant the right to require Harris Soup to remove trade fixtures *but not other alterations*. The provisions in Article 10 of the 1990 Lease that control rights concerning all alterations and trade fixture installations state, in part:

"Tenant shall not make any alterations, additions or improvements to the Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld; provided, however, that Tenant may, without the consent of the Landlord, at its own cost and expense, erect and/or install such shelves, bins, machinery and trade fixtures as it may deem advisable; and further provided that (a) the basic character of the Building shall not be altered; (b) the structure of the Building shall not be damaged; and (c) all such alterations, additions and improvements shall comply with all applicable laws, ordinances, and regulations. Tenant shall perform all alterations, additions and improvements in a good workmanlike manner. * * * Tenant may remove its trade fixtures at the termination of this Lease, but shall be responsible for any damage to the Premises as a result of said removal. If Tenant fails to remove the fixtures, and Landlord desires that they be removed, Landlord may cause the removal of the fixtures and Tenant shall reimburse Landlord for the cost of removal and restoration and Landlord may dispose of the removed property in any manner without liability to Tenant."

The 1990 Lease contained two other relevant clauses, repeated verbatim in the 1995 Lease and the 2000 Leases, that govern acceptance of the "Premises" and declare the contract to be integrated. The clause on acceptance of the "Premises" provides, in part: "The taking of possession of the Premises by Tenant shall be conclusive evidence, as against Tenant, that Tenant accepts the Premises in their then 'as is' condition and that the Premises are in good and satisfactory condition on the date that such possession is so taken[.]" The integration clause provides, in part: "This Lease contains the entire agreement of the parties and recites the entire consideration given and accepted by the parties."

On expiration of the 1990 Lease, the parties executed the 1995 Lease, which conveyed all of Building 4 and, by later amendment, some space in Building 3. The 1995 Lease takes the form of a new lease. Nothing in the 1995 Lease (or later, in the 2000 Leases) describes the lease as an extension, renewal, or amendment of a prior lease. Article 1 begins with the same initial paragraph as the 1990 Lease and, later, the 2000 Leases:

"In consideration of the obligation of Tenant to pay rent as herein provided, and in consideration of the other terms * * * hereof, Landlord hereby demises and leases to Tenant, and Tenant hereby takes from Landlord * * * the Premises located at * * * the Building[.]"

According to Article 2D of the 1995 Lease,

"Tenant shall be deemed to have taken possession of the Premises * * * when Tenant takes possession of the Premises either by occupancy or commencement of installation of equipment, interior improvements, or personal property[.]"

The 1995 Lease attached more rights and obligations to "alterations," expanding from the focus on trade fixtures in the 1990 Lease. It is the expanded Article 10, later modified only slightly in the 2000 Leases, as we will describe, that laid the groundwork for the current dispute. Article 10 of the 1995 Lease reads, in part:

"A. Tenant shall not make any alterations, additions or improvements to the Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld, with regard to Tenant's installation of shelves, bins, machinery and trade fixtures provided that (a) the basic character of the Building shall not be altered; (b) the structure of the Building shall not be damaged; and (c) all such alterations, additions and improvements shall comply with all applicable laws, ordinances, and regulations. In all other cases Landlord may withhold such consent in its sole discretion for any reason.

"B. Tenant shall perform all alterations, additions and improvements in a good workmanlike manner. All such alterations shall become part of the Building, but Landlord reserves the right to require Tenant to remove the same upon termination of this Lease and restore the Premises to their original condition. * * *

"C. * * * Tenant may remove its trade fixtures at the termination of this Lease, but shall be responsible for any damage to the Premises as a result of said removal. If Tenant fails to remove trade fixtures or alterations after notice from Landlord that they be removed, Landlord may cause the removal of the fixtures and Tenant shall reimburse Landlord for the cost of removal and restoration and Landlord may dispose of the removed property in any manner without liability to Tenant."

Article 18 of the 1995 Lease, which appears again in the 2000 Leases, is the surrender clause that controls the parties' understanding of the implications of lease termination. That provision reads, in part: "Upon the expiration or other termination of this Lease, Tenant shall quit and surrender the Premises to Landlord in as good order, condition and repair as they are now, reasonable wear and tear excepted." The 1995 Lease contains a Termination Date of July 31, 2000.

As termination of the 1995 Lease approached, Harris Soup did not exercise an extension option because the company wanted to negotiate new lease rates and early termination rights in anticipation of outgrowing Buildings 3 and 4. In June 2000, the parties simultaneously executed the two 2000 Leases: one for Building 4 and one for a larger amount of Building 3 space. In most respects, as we already have mentioned where applicable, the 1995 Lease provisions reappear in the 2000 Leases. During negotiations, however, plaintiffs negotiated to eliminate one provision in the final Building 4 lease that remained in the final Building 3 lease. That provision defined tenant's "taking of possession" in the same language that had appeared in Article 2D of the 1995 Lease. Plaintiffs wanted to distinguish the fact that their occupancy of Building 3 was expanding, while their occupancy of Building 4 was not. In addition, both 2000 Leases contained new parallel provisions granting early termination rights to Harris Soup on payment of termination fees according to detailed schedules. A minor amendment in 2001 to one of the 2000 Leases conveyed more Building 3 space but did not amend any lease provisions relevant to this dispute.

Certain negotiated changes to Article 10A in the 2000 Leases were the subject of the parties' sole discussion of

"alterations" in the process of forming the 2000 Leases. Each party argues that the trial testimony about that modification of Article 10A weighs in its favor in interpreting the intent of the parties when they formulated the 2000 Leases. In 2000, the parties agreed that Articles 10B and 10C would remain as they read in the 1995 Lease, but that Article 10A would be changed to read:

> "Tenant shall not make any alterations, additions or improvements to the Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld. With regard to Tenant's installation of shelves, bins, machinery and trade fixtures such approval shall be given provided that (a) the basic character of the Building shall not be altered; (b) the structure of the Building shall not be damaged; and (c) all such alterations, additions and improvements shall comply with all applicable laws, ordinances, and regulations."

The new language reflected a request by Greg Murphy, a consultant to Harris Soup and later its chief financial officer, to limit defendant's right to reject future non-trade-fixture alterations to the premises. Where defendant's consent to such alterations could be withheld under the 1995 Lease "in its sole discretion for any reason," Murphy asked that consent be constrained in the 2000 Leases to "not be unreasonably withheld." Tim Warren, a senior manager and an owner of defendant, agreed to the new language that Murphy proposed. The relevant trial testimony of Warren and Murphy was as follows.

"Q [defendant's counsel] * * * Was there a discussion that you had with Mr. Murphy on the subject of alterations?

"A [Warren for defendant] Yes.

"* * * * *

"A Because I remember having a conversation with Mr. Murphy, and I also made changes to text that he requested in paragraph ten.

"* * * * *

"A Well, what was being taken out was our ability to— it was reducing the scope of our rights to allow alterations to be made.

"\* \* \* \* \*

"Q What did you say to Mr. Murphy after considering this?

"A I said that it would probably be okay, because in the end we would get to take stuff out anyway if we don't like it.

"Q Okay. What did he say in response to your remark?

"A He said that: Well, you are going to want to keep improvements, aren't you?

"Q What did you say to that?

"A I said: I don't know. We may or we may not.

"Q And what did he say in response to that?

"A He said: Well, you've got some great grade A offices that we built. You are going to want to keep those, aren't you?

"Q How did you respond to his comment on the office space?

"A I said: Well, those are nice offices. Probably will.

"Q What did he go on to say?

"A He said: Well, you are going to want to keep the USDA food production plant, aren't you?

"Q What did you say in response to that?

"A I said: Greg, I'm in the landlord business, not the fresh food processing business.

"Q Did he press you on the subject of those improvements?

"A He did.

"Q What was your response?

"A My response was to say: Look, then I went to the text and read some of the text in [Articles] 10B and 10C and shutdown the conversation, and said: Let's move on.

"Q Was there any other conversation concerning alterations, the subject of alterations, either the installation of alterations or the removal of alterations that you can recall?

"A Not that I recall."

Warren testified further about the Article 10A nego-
tiations on cross-examination.

"Q [plaintiffs' counsel] Okay. Would you agree with
me that the changes requested in [Article 10A] dealt with
future alterations that might be made by the tenant?

"A [Warren] Yes.

"Q Okay. And Mr. Murphy had a concern about future
alterations that you discussed?

"A I would assume so, or he wouldn't have wanted to
make changes to it."

Murphy testified, in agreement with Warren, that
the parties did not otherwise discuss alterations when they
negotiated the 2000 Leases. He also testified without dispute
that the parties did not discuss in the course of the 2000
Lease negotiations whether defendant would expect Harris
Soup to be responsible to remove improvements existing on
the date that the 2000 Leases commenced.

We review the 2000 Leases with a focus on constru-
ing the disputed phrase "original condition" and we hold that
the 2000 Leases read unambiguously in plaintiff's favor. Our
primary task is to discern whether contested language is
reasonably subject to each of the interpretations claimed by
the parties. "Words or terms of a contract are ambiguous
when they reasonably can, in context, be given more than one
meaning." *Pacific First Bank v. New Morgan Park Corp.*, 319
Or 342, 348, 876 P2d 761 (1994).

We first note that consideration of dictionary defini-
tions does not establish a definite meaning for "original con-
dition." Although a primary interpretive rule is to give
"words of common usage their plain, natural, and ordinary
meaning[s]," limiting the construction of ordinary phrases to
that test may improperly ignore the total context of the lan-
guage of an agreement. *Cf. Dept. of Transportation v.
Stallcup*, 341 Or 93, 99-100, 138 P3d 9 (2006) (discussing
same consideration for statutory interpretation). Here, the
shortcoming of a dictionary definition is that "original condi-
tion" must be construed in relation to something, that is,

original condition relative to what? The meaning of "condition" is essentially controlled by its modifier, "original," which does not in itself define a state at a unique point in time absent other information about the use of the phrase. The dictionary definition of "original" in this context is "1 a: of or relating to a rise or beginning : existing from the start : INITIAL, PRIMARY, PRISTINE * * * b: constituting a source, beginning, or first reliance[.]" *Webster's Third New Int'l Dictionary* 1592 (unabridged ed 2002). That definition allows us to consider that "original" may mean "*a* beginning"—leaving the same problem of relativity, that is a beginning relative to what? But, we must also consider that "original" may mean "existing from the start"; again, from the start of the 2000 Leases, or from the start of plaintiffs' occupancy of each part of the premises? Dictionary analysis suggests that the term might be ambiguous as used, but we must look to the context of related lease provisions to determine whether that possible ambiguity survives construction of the lease as a whole.

When we examine the phrase "original condition" in the context of the lease provision where it arises, we reach a preliminary conclusion that the phrase can reasonably be read only in a manner that is favorable to plaintiffs. The first sentence of Article 10A of the 2000 Leases broadly applies to all tenant modifications to the premises: "Tenant shall not make any alterations, additions or improvements to the Premises without the prior written consent of Landlord[.]" That provision strictly governs future activity under the 2000 Leases because it defines the landlord's right to control the tenant's ability *to make* alterations. It addresses nothing about alterations made in the past. The first sentence of Article 10B similarly controls only how the tenant may perform future alteration activity: "Tenant shall perform all alterations, additions and improvements in a good workmanlike manner." The second sentence of Article 10B provides that "such alterations," that is, all future alterations that are the subject matter of Article 10, "shall become part of the Building." That sentence continues with an expression of defendant's right to make plaintiffs remove "the same," that is, again, the future alterations covered by Article 10, "upon termination of this Lease," that is, each of the 2000 Leases, "and restore the Premises to their *original condition*." This is the

single instance in which the phrase "original condition" occurs in the 2000 Leases. It is similarly only so used in the predecessor leases. Reading "original condition" in its local context, the phrase logically means the condition of the premises before tenant makes any "such alterations" subject to Articles 10A and 10B, that is, possible alterations to be made during the terms of the 2000 Leases. This localized reading supports only plaintiffs' interpretation that "original condition" refers to the condition of the premises when the 2000 Leases commenced—that is, the "original" point in time precedes only future alterations that might be made during plaintiffs' newly established tenancy. There is no support in the literal language of Article 10 for defendant's argument that "original condition" refers back to conditions of the premises as they were before the terms of the earlier leases.

Our conclusion does not change when the analysis incorporates the context of related lease terms. The 2000 Leases are complete, new lease agreements, not amendments or renewal leases, and they contain an integration clause that says "[t]his Lease contains the entire agreement of the parties and recites the entire consideration given and accepted[.]" When the parties wished instead to amend, renew, or extend their leases, they did so several times, under the 1990, 1995, and 2000 Leases. With respect to consideration, Article 1 expressly states that, under "this Lease" (emphasis added), the consideration given is plaintiffs' obligation to pay rent and acceptance of other conditions, and the consideration accepted is the taking of the "Premises" from the landlord. Thus, the integration clause clearly conveys that any inconsistent understanding of the parties under the preceding leases does not survive execution of the 2000 Leases. Furthermore, the 2000 Leases show integration on the topic of alterations because they address all alterations, whenever made: Article 10 expressly governs future alterations; and Article 1 provides that plaintiffs expressly lease all of the Premises as defined, that is, the Building including past alterations, with the exception of the treatment of trade fixtures that we discuss further below.[4] The clause defining possession says that "tak[ing] possession" is satisfied by

---

[4] Although the definitions of "Premises" and "Building" are circular, with each incorporating the other, the reasonable construction is that they are used as synonymous terms in the leases.

occupancy, which was satisfied as of the "Commencement Date" of the 2000 leases. The acceptance clause says that plaintiffs' taking of possession is conclusive evidence that plaintiffs accept the "Premises" in their "as is" condition on the date of possession, that is, the "Commencement Date" of the leases.

Plaintiffs did create a minor inconsistency in the final leases by negotiating away the definition of "taking possession" in the 2000 Lease of Building 4, but we conclude that that is a distinction without a difference. Other provisions remaining in the Building 4 lease, stating that plaintiffs leased the "Premises" under "THIS LEASE AGREEMENT" from the "Commencement Date" in their "as is" condition, show that possession ended under the old lease and then began immediately, with a refreshed definition of "Premises," under the new lease.

Defendant argues that we must construe "original condition" to have a meaning other than "at the commencement of the 2000 Leases" because the surrender clause refers to the "Premises" in the condition "as they are now." Defendant relies on the canon of construction "that different, but similar, terms in [the] same statute ha[ve] distinct meanings." *State v. Pine*, 336 Or 194, 205, 82 P3d 130 (2003). However, we apply all maxims with restraint, and defendant is relying on one with stronger application to language shaped by the legislature and legislative counsel. As between private parties, we think it is necessary to be more open to the parties' natural use of language, which may include synonyms or even surplusage. *Cf. RealVest Corp. v. Lane County*, 196 Or App 109, 118, 100 P3d 1109 (2004) (interpreting "right of way" in deed language to be surplusage). Here, however, whether or not one applies the "distinct meanings" canon, the two phrases have subtly different meanings in context. The full text of the surrender clause says that plaintiffs shall return the "Premises" on lease termination *"in as good* order, *condition* or repair *as they are now,* reasonable wear and tear excepted." (Emphasis added.) "In as good * * * condition * * * as they are now" describes the *quality* of the space before wear and tear caused by plaintiffs' future use, while "original condition" describes the *content* of the space before future alterations are made.

Finally, we consider the extrinsic evidence surrounding the circumstances of contract formation. That evidence concerns the parties' negotiations to change Article 10A in 2000 and the evolution of Article 10 as a whole across the succession of leases. The evidence shows that the single negotiating session concerning Article 10A, testified to by Warren and Murphy, was the only time that the parties discussed "alterations" during negotiation of the 2000 Leases. We have carefully considered the content of that testimony because the trial court expressly relied on it, but conclude that it did not address the issue that divides the parties here. Warren testified that plaintiffs' request for a change to Article 10A concerned consent rights to future alterations. When Warren "read some of the text in [Articles] 10B and 10C" to Murphy, he did no more than read clauses that concerned the treatment of future alterations under the 2000 Leases, as we have already discussed. In fact, Warren testified that there was no discussion, period, concerning the removal of alterations. The testimony makes no reference to cost or liability that might permit a factfinder to infer that there was a special understanding between the parties about liability for the cost of removing then-existing alterations. Given the limited nature of the conversation, Murphy's questions about defendant's desire to keep certain improvements can be read at most as exploration of the topic of the negotiation, that is, whether defendant might withhold consent for future improvements.

The last extrinsic evidence we consider concerns the evolution of Article 10 language over successive lease terms. Much of the final Article 10 language originated in the 1990 Lease, but that version focused on trade fixtures, or more precisely, "shelves, bins, machinery and trade fixtures." The 1990 version of Article 10 allowed plaintiffs to install such fixtures without defendant's consent. It also allowed plaintiffs to remove, or defendant to cause removal of, such fixtures at the termination of "this Lease," in either case at plaintiffs' expense. General application of the 1990 provision to all future alterations was very limited. Plaintiffs could not make nonfixture alterations without defendant's written consent, which would not be unreasonably withheld. Also, plaintiffs were on notice that all alterations must comply with

applicable laws and could not result in a change to the character of the "Building" or cause structural damage, and that plaintiffs had to perform all construction in a workmanlike manner. Furthermore, by the absence of an express statement of right, defendant had no removal rights concerning nonfixture alterations.

As we have described, the 1995 Lease parsed the basic Article 10 subject matter taken from the 1990 Lease into Articles 10A, 10B, and 10C while introducing substantive changes. Article 10A addressed consent. Under the 1995 Lease, plaintiffs needed consent that would not be unreasonably withheld to make "fixture" types of alterations. For "all other" alterations, defendant could withhold consent "in its sole discretion for any reason." Plaintiffs were on notice that "fixture" alterations must comply with all laws and could not change the character of the "Building" or cause structural damage; however, that provision no longer applied to all alterations.

Article 10B applied to all alterations, including trade fixtures, and expanded defendant's removal rights "upon termination of this Lease" to cover non-trade-fixture alterations. Article 10B required plaintiffs to perform all alterations in a workmanlike manner and made all alterations part of the "Building," unless defendant exercised its new right to have plaintiffs remove nonfixture alterations upon termination of "this Lease" and restore the "Premises" to their original condition.[5]

Article 10C concerned trade fixtures only, and—like the 1990 Lease—allowed plaintiffs to remove, or defendant to cause removal of, all such fixtures at the termination of "this Lease," in either case at plaintiffs' expense. Article 10C continues the parties' original understanding from the 1990 Lease that all trade fixtures, whenever made, could be removed at the termination of each lease, based on either plaintiffs' choice or defendant's demand, and always with plaintiffs' liability for the costs of removal and restoration.

---

[5] The 1995 Lease uses the same language as the 2000 Leases in other provisions, collectively creating a single plausible interpretation that plaintiffs leased the "Premises" including alterations made during the preceding 1990 Lease term at the commencement of the 1995 Lease.

We cannot ignore that the second sentence of Article 10C, introduced in the 1995 Lease, adds a small complication to our analysis because it purported to address plaintiffs' "fail[ure] to remove *trade fixtures or alterations*," but only allowed defendant to "cause the removal of the *fixtures*." Read in conjunction with defendant's new removal rights in Article 10B of the 1995 Lease, we conclude that the parties tried to reiterate those expanded removal rights in Article 10C. However, that attempted expansion from the original language on trade fixture removal rights was merely redundant with the nonfixture removal rights fully articulated in Article 10B. Despite the sloppy editing, Article 10C in the 1995 Lease is reasonably susceptible only to the interpretation that we have given here. We conclude that the 1995 modifications did not introduce an ambiguity. In the 1995 Lease, restoration to "original condition" in Article 10B refers to conditions as they were at the beginning of the 1995 Lease and applies to all alterations except trade fixtures, removal of which is more specifically governed by the exception provided in Article 10C. Because alterations generally became part of the "Building" if not removed on termination of that lease, with the express exception that all trade fixtures were subject to possible removal under Article 10C, non-trade-fixture alterations became part of the "Premises" to be leased under any successor lease.

Based on this chronological analysis of the successive lease provisions, we reach the following conclusions regarding the provisions of Article 10 in the 2000 Leases. First, Article 10 of the 2000 Leases preserved the rights and obligations from the parallel provisions of the 1995 Lease with the exception of the changes to Article 10A about which the parties testified at trial. Article 10A governs consent to all future alterations, as negotiated by Warren and Murphy. Namely, defendant would not unreasonably withhold consent to any future alterations, but trade fixture installations in particular would be approved as long as plaintiffs complied with all laws and did not change the character of the "Building" or cause structural damage. Article 10B also governs all future alterations during the 2000 Lease periods; it requires their workmanlike construction, makes them "part of the Building," and grants defendant general removal rights

"upon termination of this Lease." Article 10C expresses the exception conditions that govern the parties' removal rights for trade fixtures, whenever installed.

Defendant argues that Harris Soup's removal of trade fixtures when it vacated Buildings 3 and 4 means that plaintiffs relied on removal rights under the 1990 and 1995 Leases, and contradicts plaintiffs' more narrow construction of defendant's removal rights with respect to non-trade-fixture alterations. Defendant's argument is unavailing because the final leases provide different, though overlapping, installation and removal rights for trade fixture installations relative to other alterations. Defendant characterizes the removed items as "trade fixtures" that included "kettles, a large boiler, a conveyor system, and other fixtures." Accepting defendant's statement that the removed items were "trade fixtures" without deciding whether that characterization is legally correct for all the items removed, we conclude that plaintiffs relied on the express exception that governed the treatment of trade fixtures across the succession of leases. Article 10C of the 2000 Leases repeats the language of the 1990 and 1995 Leases that "[t]enant may remove its trade fixtures at the termination of this Lease." Which trade fixtures may be removed is not time bound. Read together, the series of leases expressly provides that trade fixtures remained plaintiffs' property across successive lease terms. Thus plaintiffs could remove them on termination of the final lease, or defendant could require that they be removed, subject to plaintiffs' liability for restoration and removal costs. That interpretation does not contradict our construction of the other "alteration" provisions of Article 10 of the 2000 Leases.

We need not consider defendant's additional arguments in defense of the trial court's decision because we conclude that the 2000 Leases read unambiguously in plaintiffs' favor, but we must address one other argument by which defendant seeks to prevail as a matter of law. Defendant contends that Oregon law presumes that a party's removal rights under an earlier lease survive implicitly through successive lease periods for the same premises. To support its contention, defendant cites *Lilenquist v. Pitchford's, Inc.*, 269

Or 339, 525 P2d 93 (1974), and *Blake-McFall Co. v. Wilson*, 98 Or 626, 193 P 902 (1921). Defendant overextends the rule from *Lilenquist*, which actually states more narrowly that

> "a new lease is presumed to continue the *tenant's exist-ing [personalty] removal rights* acquired under a previous lease unless the language or circumstances of its execution show an intent on the part of the *lessee* to abandon[.]"

269 Or at 349 (emphasis added).[6] Defendant must be relying on only the third of three distinct disputes over removal rights in *Lilenquist* because that is the instance in which the quoted rule applied. *Id.* at 348-49. The court held that the les-see, Lilenquist, was the owner of a building through succes-sive lease terms despite possession by a sublessee and that the building had remained personalty by express agreement. She benefitted from the court's presumption that she retained her ownership rights in personalty, including the right to remove, unless the parties affirmatively agreed otherwise. The first aspect of *Lilenquist* that is inapposite here is that the court applied the presumption because it held that Lilenquist's express contractual removal rights were *ambiguous. Id.* at 349. Second, the dispute involved her rights as lessee against the landowner, not against the sub-lessee, which implicated the general principle that we read ambiguous lease language in favor of the tenant. *Russell v. Sealed Power Corp.*, 278 Or 243, 247, 563 P2d 712 (1977). Third, the court applied the presumption from *Blake-McFall*, 98 Or at 647, that saves a *tenant's right* to remove *personalty*, to avoid "a trap and a snare for the unwary tenant" when a new lease does not affirmatively extinguish that right. The combination of contractual ambiguity, her *tenant* status, and the court's predicate finding that Lilenquist owned the

---

[6] We know *Lilenquist* concerns personalty rather than real property because the court applied a holding to that effect in its resolution of all the issues in the case:

> "While buildings are usually considered part of the realty to which they are attached, parties to a lease may agree that they shall retain their character as personal property. By virtue of various lease provisions providing for removal of buildings the parties here and the landowner did so agree."

*Id.* at 343-44 (citations omitted). Defendant here did not argue that the disputed alterations qualified as personalty.

building as *personalty* generated the Supreme Court's iden-
tification of her surviving right to remove what she had con-
structed under an earlier lease.[7]

 *Lilenquist* and *Blake-McFall* do not establish a pre-
sumption that *any* party's removal rights of *any* property
under an earlier lease survive implicitly in successive leases
of the same premises. Rather, those decisions protect a ten-
ant's rights in personalty where the tenant has proved his or
her continuing ownership of the personal property under suc-
cessive leases. Defendant here, as a landlord who seeks to
force a tenant to remove real property improvements, does
not benefit from the application of *Lilenquist* and *Blake-
McFall*. Considering the underlying sources of the presump-
tions applied in those cases, which are intended to favor ten-
ants and owners of personalty, it is not sensible to extend
their application to benefit landlords contesting rights to real
property.

 Defendant's argument that it is unreasonable to
expect a landlord to have exercised its right under an earlier,
predecessor lease to require the removal of alterations is also
unavailing. The realistic view is that defendant had other
than literal means to exercise its removal rights on termina-
tion of the 1995 Lease. As landlord and as drafter of the lease
documents, defendant exerted significant control over the
terms of the 2000 Leases. An example of defendant's control
and competence to negotiate express rights is defendant's
enhancement in the 1995 Lease of its right to require
removal to apply to all future alterations, not just to trade fix-
tures. In addition, defendant was able to negotiate new pro-
visions for early termination fees in the 2000 Leases in
exchange for granting plaintiffs' desired early termination
rights. Defendant agreed to enter into an entirely new lease
in 2000 with clear knowledge that plaintiffs were continuing
their occupancy although expanding it to some degree.

---

[7] If applicable at all, the holdings of *Lilenquist* and *Blake-McFall* would tend to
support plaintiffs' claimed right to remove trade fixtures installed in prior lease
terms rather than defendant's claimed right to require the removal of other alter-
ations constructed in prior lease terms. We do not reach that argument because we
have concluded that the disputed language in the 2000 Leases is unambiguous, and
plaintiffs have not argued the application of the cases in their favor.

Defendant also knew that plaintiffs had made material alterations during the 1995 Lease term because that lease required defendant's prior consent to any non-trade-fixture improvements. The parties agree that alterations were not made without the necessary consent. If defendant intended to modify the nature of the space that plaintiffs agreed to rent in 2000, defendant could have negotiated rights and obligations concerning past alterations and the modification of provisions such as the definitions of the "Building" and the "Premises" to be leased.

In sum, we conclude that there is no ambiguity in the alteration provisions of the 2000 Leases. "Original condition" is a relative term that is controlled by the interaction of Articles 10A, 10B, and 10C of the 2000 Leases with the consistently defined meanings of "Building" and "Premises" in the succession of leases. The term refers to the condition of the premises that existed before plaintiffs made non-trade-fixture alterations under the 2000 Leases. The trial court erred in concluding that plaintiff was liable for the cost to remove non-trade-fixture alterations that existed before the 2000 Leases commenced. Because we vacate the judgment and remand to the trial court to enter the declaratory judgment that plaintiffs sought and to determine the damages that plaintiffs owe based on their more limited scope of liability, we dismiss defendant's cross-appeal as moot.

Judgment vacated and remanded for further proceedings; cross-appeal dismissed as moot.