Argued and submitted November 28, 2017, affirmed March 18, 2020

In the Matter of the Marriage of

Marcia Ann BAERTLEIN,
*Petitioner-Respondent,*
*and*

Brian STOCKS,
*Child Attending School-Respondent,*
*and*

Bradley Hase STOCKS,
*Respondent-Appellant.*

Washington County Circuit Court
C042522DR; A162793

464 P3d 433

Father appeals a judgment concluding that, under a 2014 stipulated judgment modifying child support and the payment of college expenses, the amount each parent was required to pay for college costs was to be calculated as a percentage of the University of Oregon projected amount for the relevant academic year, regardless of the child's actual costs, and without regard to scholarships. The trial court also ruled that father was not entitled to a credit for payments he had made for one term for one child, when she ultimately did not complete the term. Father also appeals a supplemental judgment awarding mother and one child their attorney fees and costs. *Held*: Considering the text, context, and extrinsic evidence of the circumstances underlying its formation, the trial court did not err in its interpretation of the 2014 stipulated judgment. The court also did not err in denying father a "carry-over" credit, because father presented no viable legal theory entitling him to such a credit. Mother and child were entitled to attorney fees pursuant to ORS 107.135(8) because mother's action to enforce the 2014 stipulated judgment, which child joined, was "materially and reasonably" related to father's motion to modify child support. *Berry v. Huffman*, 247 Or App 651, 660, 271 P3d 128 (2012).

Affirmed.

Kirsten E. Thompson, Judge.

Janet M. Schroer argued the cause for appellant. Also on the briefs were Lindsay H. Duncan and Hart Wagner LLP.

William R. Valent argued the cause for respondents. Also on the joint briefs were David N. Hobson, Jr., and Hobson and Associates, LLC.

Before DeHoog, Presiding Judge, and Egan, Chief Judge, and Aoyagi, Judge.

DEHOOG, P. J.

Affirmed.

## DEHOOG, P. J.

This appeal involves the interpretation of a stipulated supplemental judgment governing the payment of child support and college costs for two of the parties' children, Melissa and Brian.[1] The trial court concluded that the stipulated judgment (the 2014 judgment or the judgment) reflected mother's and father's agreement that the projected cost published on the University of Oregon's website for a typical in-state undergraduate student living on campus was the amount from which their respective pro rata contribution for college expenses would be calculated each year, regardless of whether a child's actual costs were higher or lower. Father appeals the trial court's resulting supplemental judgment and money award (the enforcement judgment) and a subsequent supplemental judgment awarding attorney fees to mother (the attorney fees judgment).

With regard to the enforcement judgment, father raises three assignments of error. In his first two assignments, father contends that the court erred in interpreting the 2014 judgment to require a "fixed minimum amount" from which the parties' contributions were to be calculated based on the University of Oregon estimated cost; in his view, the judgment unambiguously provides that the parties' percentage contributions were to be determined by reference to the children's actual college costs, *up to* the University of Oregon cost. Father further argues that extrinsic evidence demonstrates that that was the parties' intent. In his third assignment of error, father contends that the court erred in concluding that he was not entitled to a credit for payments he made for Melissa's fall 2014 college expenses that were not ultimately used for that purpose. For the reasons that follow, we conclude that the trial court did not err in

---

[1] For convenience, we follow the convention used by the parties and the trial court and refer to the principal parties as "mother" and "father" in this opinion. Their son Brian Stocks, as a child attending school, is also a named party in the case, *see* ORS 107.108(3) ("[A] child attending school is a party to any legal proceeding related to the support order."); however, because he and mother filed a joint answering brief, we refer to their arguments collectively as "mother's" arguments.

The parties' eldest child had already completed college at the time of the stipulated supplemental judgment and it therefore did not affect her.

interpreting the 2014 judgment and, therefore, affirm the enforcement judgment.

In separate briefing, father raises three additional assignments of error challenging the trial court's judgment awarding attorney fees. We affirm that judgment as well.

We begin by summarizing the historical facts, taken from the trial court's findings and the record. Additional relevant facts are set out in connection with our discussion of father's assignments of error. Unless otherwise noted, the facts are undisputed.

Mother and father were married in 1984 and divorced in 1998. They have three adult children; as indicated above, this case involves the parties' agreement to pay college costs for their two youngest children, Melissa and Brian. At the time of the hearing in this case, Brian was 19 years old, and a freshman at the University of Oregon. He had been awarded a $24,000 scholarship, which was to be paid out at $6,000 per year. Melissa, then aged 22, was enrolled at Arizona State University; she had been awarded a scholarship of $8,000 per year.

The parties' original Marital Settlement Agreement (MSA), the terms of which were incorporated into a stipulated general judgment of dissolution in 1998, provided that the parties' support obligation would continue beyond the children's age of majority until each child had five consecutive calendar years after graduation from high school to attempt to complete an undergraduate college degree, as long as the child was a "child attending school" as defined by ORS 107.108. Support for college children was to be computed as follows:

"(1)  Support shall be computed to fund the anticipated annual costs of the child's college education years, the annual amount to be computed each August prior to the start of school.

"(2)  The total costs shall be projected and the maximum liability for the parties shall be based on the total comprehensive costs chargeable at the University of Oregon, as reported out by that school each year, including tuition, room and board, books, fees, and projected incidental

costs. Amounts anticipated for the child which exceed the University of Oregon rates shall not be the responsibility of the parties.

"(3)   The parties shall pay a pro rata share (based on annual income) of the annual expense projected in the fashion designed to meet the requirements for payment of the institution attended by the child.

"(4)   Monies which are earned by the child which might be available for payment of college costs as listed above, shall be applied to those costs only if the parties and the child agree. Otherwise, those earned funds shall be available to pay the child's transportation costs and other incidental living expenses not paid by the parties.

"(5)   Scholarships, grants or gifts received by the child or on behalf of the child from third parties shall reduce the parties' responsibilities first. That is, the parties' maximum responsibility as defined by the University of Oregon rates shall be reduced by funds from these sources unless otherwise agreed between the parties. (For example, the parties could agree that such funds could be used to allow the child to attend an out-of-state school or a private school and to not affect the parties' pro rata contribution.)"

Over the years since the dissolution judgment, the parties have modified their child support and college expense obligations several times. In December 2009, the parties entered into a stipulated supplemental judgment modifying child support (the 2009 judgment), in which they agreed to meet each May to recalculate child support and their pro rata share of college expenses for the children then entitled to support, determined primarily by their respective incomes. The judgment divided support for an 18-to-21-year-old child attending school into two categories:

"A.   The child support for summer shall be the amount either party would pay for that child pursuant to the guidelines calculation done for the minor child, and each parent shall pay to the college child that sum per month during the three summer months the child is not in school[.]

"B.   For the nine additional months of each school year, the total expenses for the child will be agreed upon each May, using the projected expenses for the school which the child plans to attend in the fall.

"C.   The annual May agreement to be reached by the parties shall settle child support, but also the pro rate of the parent's income shall be established for purposes of computing 18-to-21 support. The parents will apply that pro rate prospectively for the next college year to the total budget expense determined for the child, and will pay that budget expense to the child, or as agreed upon with the child toward the child's expenses. The parents' obligation pursuant to that nine-month projected expense amount will be capped by the comprehensive fee list published by that school, as of May of the preceding year, and in no event will the parents be obligated to pay for such expenses on comprehensive lists which are not Oregon state schools. \*\*\*."

The parties also stipulated to the appointment of a mediator, Greg Soriano, if they were unable to agree to a new support amount by May 15 each year.

In January 2014, a dispute arose over the payment of college expenses for Melissa, and Soriano mediated the matter. Following that mediation, in March 2014, the parties agreed to modify the 2009 judgment in yet another "Stipulated Supplemental Judgment Modifying Child Support and Payment of College Expenses"—the 2014 judgment at issue here. Section 1 of the 2014 judgment provides that the agreements reached in the judgment "will supersede all previous orders/judgments regarding college expenses and child support" for Melissa and Brian. Section 2 then recites that the parties had entered into a financial agreement—attached to the judgment as Exhibit A— whereby they

"have agreed on a framework to handle current expenses for MELISSA STOCKS as a child attending school and for the minor child BRIAN STOCKS going forward. It is the intent of the parties that there will no longer be an annual review. They have set the base line [*sic*] for future support and college expenses based on their pro rata share of expenses."

The remaining paragraphs of Section 2, which essentially duplicate Exhibit A, set out that framework, providing, as relevant:

"C.   College Expenses:

"College expenses will be paid based on the projected 'Resident, On-Campus Estimated Total' from the University of Oregon website (See example for the current 2013/2104 academic year totaling $23,904.00 attached to Exhibit A, pages 3-4) for each academic year through BRIAN STOCKS' senior year in college. All future college expense for MELISSA STOCKS and BRIAN STOCKS will be capped at this estimated University of Oregon rate for the appropriate academic year, regardless of the college they choose to attend.

"D.   Pro Rata Share:

"Father will pay 70% of college expenses based on the above College Expense guideline. Mother will pay 30% of college expenses based on the above College Expense guideline.

"E.   Employment:

"In that it is understood by both parents that the funding of college is important and shared financial responsibility, the college pro rata share (70% by Father and 30% by Mother), shall remain in force unless either of the parties becomes unemployed for cause, and provides related documentation from their respective employer. Reasons such as voluntary reduction in hours, retirement and/or resignation shall not change the pro rata share."

In October 2015, mother filed a motion to enforce the 2014 judgment, alleging that father had failed to pay his pro rata share of college expenses for Brian.[2] The court held an evidentiary hearing on mother's enforcement motion over the course of three days in March and April 2016, considering, as relevant on appeal, two interrelated issues requiring interpretation of the 2014 judgment: (1) how college expenses are determined; and (2) whether mother's and father's contributions for college expenses are to be reduced by scholarships or other awards received by

_____

[2] Mother amended her motion in February 2016 after retaining counsel; the amended motion is the operative filing here. Among other things, the motion specifically requested the court to find that father's obligation to pay his 70 percent share of the children's college expenses was not reduced by scholarships or other financial considerations. Brian joined in mother's motion. Both children also requested ORCP 17 sanctions against father, which the court declined to impose.

the children.[3] The court admitted documentary evidence and allowed testimony from several witnesses, including Soriano, mother, father, Brian, and Melissa.[4]

After the hearing, the court issued a letter opinion concluding that, under the 2014 judgment, the amount the parties were each required to pay for college costs was to be calculated as a percentage of the University of Oregon published rate for the relevant academic year, regardless of the child's actual costs, and without regard to scholarships. The court described the parties' arrangement for calculating child support under the 2009 judgment and the changes from that judgment to the 2014 judgment, including that the parties had "agreed to have no further annual reviews for child support or college expenses, but rather to 'set a baseline for future support and college expenses based on their pro rata share of expenses.'" (Boldface omitted.) Specifically, with regard to that agreement, the court found:

"The parties agreed that both the baseline and the cap for college expenses would be determined by reference to the University of Oregon budget for the relevant academic year for a typical in-state undergraduate student living on campus. Despite Father's arguments to the contrary, the Court finds that this is the amount they agreed to pay whether the child's actual costs were higher, or lower. In exchange for this promise to pay, the agreement was intended to prevent future modifications by either party, and stop the annual exchange of detailed information about their incomes and financial circumstances.

"Prior agreements, and practices of the parties regarding utilizing different schools, or considering scholarships received by the children were not continued in the March 2014 judgment. The parties explicitly agreed not to exchange their own income information, and limited the bases for a change in the agreement to an involuntary loss of income. Thus, if either party has experienced an increase in resources which would vary their percentage of

---

[3] The court also considered whether the parties' obligation to pay college expenses for Melissa had terminated, whether the parties were required to participate in future mediation, and whether ORCP 17 sanctions were appropriate in the case, as well as *father's* motion to modify child support, which the court denied. None of those rulings are at issue on appeal.

[4] As relevant to our analysis, some of that evidence is discussed below.

contribution to college expenses or support, the other party is prohibited to raise this as an issue.

"* * * * *

"College expense shall be paid by each parent in the 70/30 split described in the supplemental judgment. The children's resources were not discussed or considered in creating this budget, therefore their resources, including scholarships, are not to be deducted from the contributions agreed to by the parents. The agreement of the parties requires the parents to pay a fixed amount for college expenses whether it is less or more than the child's actual need, and to do so without further inquiry into the budget of any of the parties."

The court also rejected father's suggestion that he receive a credit for amounts he paid toward Melissa's fall 2014 college term. The court subsequently entered a judgment (the enforcement judgment), incorporating the findings of fact and legal conclusions from its letter opinion and ordering father to pay $11,567 to mother for excess contributions that she had made for Melissa's and Brian's college expenses.[5] Father appeals.

In his first assignment of error, father contends that the trial court erred in concluding that the 2014 judgment unambiguously "require[s] the parties to pay a fixed minimum amount of college expenses, regardless of whether the children's actual costs are less" and, therefore, ordering father to pay mother for her "excess contributions" to the children. Applying the framework for interpreting contracts set out in *Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997), he reasons that the 2014 judgment unambiguously does *not* establish a minimum-contribution requirement based on the University of Oregon's estimated costs and the trial court, in concluding otherwise, inserted omitted terms in violation of ORS 42.230 (in construing an instrument, the judge is not to "insert what has been omitted"). Alternatively, he contends that, even if the judgment is ambiguous, the extrinsic evidence considered by the court demonstrates that that was not the parties' intent. Therefore, according

_____

[5] Father also timely filed a motion for a new trial under ORCP 64, which was deemed denied by operation of law on August 2, 2016.

to father, because Brian's actually incurred college expenses were less than the University of Oregon's estimate, the court erred in "requir[ing father] to pay under his college expense obligation money that Brian did not actually expend for college expenses."

In the same vein, in his second assignment, father contends that the trial court erred in finding that the 2014 judgment "prohibit[s] a reduction of the parties' obligation to pay 'college expenses' by the amount of scholarships or other financial awards received by the children, resulting in the trial court's erroneous finding that Mother made 'excess contributions' to the children." Again, father argues that the judgment language is unambiguous in that it only requires the parties to pay college "expenses" up to the University of Oregon rates and, to the extent the children[6] have scholarships that reduce their college tuition, those amounts are not "expenses." And, even if the judgment is ambiguous, extrinsic evidence establishes that intent.

Those two assignments present essentially the same issue—whether the court correctly interpreted the 2014 judgment to set a fixed amount (the University of Oregon estimated cost) from which the parties' respective shares of their children's college costs for a particular academic year are to be calculated, or whether, as father argues, those shares are to be determined based on actual costs, with the University of Oregon rates providing the upper limit only.

The terms of a stipulated judgment in a proceeding to enforce a judgment of dissolution, including support provisions, are enforceable "[a]s contract terms using contract remedies." ORS 107.104(2)(a);[7] *Matar and Harake*, 353 Or 446, 458-59, 300 P3d 144 (2013). Accordingly, the court interprets those terms in

---

[6] Father refers only to Brian in his briefing; however, the record indicates that Melissa also had a scholarship and the court ordered father to reimburse mother for excess contributions she had made to Melissa's college expenses as well.

[7] ORS 107.104(2)(a) provides, as relevant:

"In a suit for marital annulment, dissolution or separation, the court may enforce the terms set forth in a stipulated judgment signed by the parties ***:

"(a) As contract terms using contract remedies[.]"

> "the same manner as other contractual provisions, *Moon v. Moon*, 140 Or App 402, 407, 914 P2 1133, *rev den*, 323 Or 484 (1996), that is, by examining the text within the context of the whole document to determine the parties' intentions; examining extrinsic evidence of the parties' intentions if text and context are ambiguous; and, as a last resort, employing maxims of construction. *Yogman v. Parrott*, 325 Or 358, 360-65, 937 P2d 1019 (1997)."

*Patterson and Kanaga*, 206 Or App 341, 348, 136 P3d 1177 (2006). In determining at the first step of the analysis whether a contract provision is ambiguous, in addition to the text and context, the court may also "consider evidence of the circumstances underlying the formation of the contract." *Id.* at 349 (citing ORS 42.220; *Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 315, 129 P3d 773, *rev den*, 341 Or 366 (2006)); *see also Grossman and Grossman*, 338 Or 99, 108, 106 P3d 618 (2005). When a provision can reasonably be interpreted more than one way, it is ambiguous. *Patterson*, 206 Or App at 349.

We review the trial court's interpretation of a stipulated judgment for legal error. *Tucker and Tucker*, 293 Or App 398, 402, 428 P3d 945 (2018). The initial question whether a judgment provision is ambiguous is also a question of law. *Harris v. Warren Family Properties, LLC*, 207 Or App 732, 737, 143 P3d 548 (2006). Where the court's interpretation depends on extrinsic evidence, "'we review the court's explicit and implicit findings of fact for any evidence in the record to support them, and the legal consequences of those facts for legal error.'" *Id.* (quoting *Batzer Construction, Inc.*, 204 Or App at 319); *see also Ibarra v. Conn*, 261 Or App 598, 599, 323 P3d 539 (2014) ("As in other equitable proceedings, 'we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome.'" (Quoting *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013).)).

We begin with the text of the 2014 judgment. The key provision, Section 2 C, states:

> "*College expenses will be paid based on* the projected 'Resident, On-Campus Estimated Total' from the University of Oregon website (See example for the current 2013/2014 academic year totaling $23,904.00 attached to Exhibit A, pages 3-4) for each academic year through BRIAN STOCKS' senior year in college. All future *college expense* for MELISSA STOCKS and BRIAN STOCKS will be *capped* at this estimated University of Oregon rate for the appropriate academic year, *regardless of the college they choose to attend.*"

(Emphases added.)

Father's textual argument relies on the meaning of the phrase "college *expenses*," which is not defined in the judgment. In his view, "[b]y their [*sic*] plain and natural meaning, logic and reason, the term 'college expenses' as used in the 2014 judgment means just that, amounts incurred or expended toward college." (Underscoring in father's brief.) For that proposition, father points to a dictionary definition of "expense" as meaning "something that is *expended* in order to secure a benefit."[8] *Webster's Third New Int'l Dictionary* 800 (unabridged ed 2002) (emphasis added). Thus, according to father, the judgment unambiguously provides that his obligation extends only to costs actually incurred.

However, the word has other meanings. Notably, the noun "expense" is also defined as "the financial burden involved typically in a course of action or manner of living : COST." *Id.* Thus, the phrase "college *expenses*," as used here, could mean "the financial burden" or "cost" "involved typically" in attending college, which supports the trial court's (and mother's) interpretation. Indeed, when considered in context, that is the more likely meaning of the phrase. That is, given that the division of responsibility for the financial burden of their children's college educations was the precise subject of the parties' agreement, they likely used the phrase "college expenses" in that sense. *See State v. Cloutier*, 351 Or 68, 96, 261 P3d 1234 (2011) ("Dictionaries, after all,

---

[8] Father quotes an additional definition—"the act or practice of expending money : SPENDING." *See Webster's* at 800. However, as *Webster's* notes, that definition is archaic, *id.*, and father does not explain why it nonetheless is pertinent here, *see id.* at 17a (§ 8.1.2) ("The temporal label *archaic* means standard after 1755, but surviving in the present only sporadically or in special contexts[.]").

do not tell us what words mean, only what words *can* mean, depending on their context and the particular manner in which they are used." (Emphasis in original.)).

At oral argument, father also suggested that the use of the words "based on" in conjunction with the University of Oregon rate indicates that that amount was simply a "starting point," but that the parties' obligation could be less, depending on actual cost. In other words, father argues that "based on" signals flexibility, contrary to the trial court's understanding. However, we perceive a flaw in that reasoning, specifically this: If the parties intended to pay a percentage of *actual* college costs, as he asserts, there seemingly would be no need to reference a starting point at all.

In any event, we do not understand the phrase "based on" to carry the meaning that father ascribes to it. The transitive verb "base" means, as relevant, "to make or form a foundation for" or "to use as a base or basis for : ESTABLISH, FOUND —used with on or upon (~ his position on a wide and shrewd scrutiny of man ***)." *Webster's* at 181. And "on," in this context, means "with regard to : with reference or relation to : ABOUT." *Id.* at 1575. Thus, the phrase "based on" is likely meant to identify the "foundation" or "basis" from which the parties' *percentage shares* could be calculated. That understanding also appears consistent with "based on" as used in Section 2 D of the judgment ("Father will pay 70% of college expenses based on the above College Expense guideline. Mother will pay 30% of college expenses based on the above College Expense guideline.").

Although father does not rely on it, we observe that the reference to a "cap" in the final sentence of Section 2 C raises a potential inconsistency, one that reflects the converse of the flaw we identified in father's argument—specifically, if, as the trial court determined, the parties agreed to *fix* the number at the University of Oregon rates, why the need to state it as an *upper* limit? *See Webster's* at 68a ("cap," as relevant, means "to prevent from growing or spreading : set an upper limit on"). However, the sentence in its entirety states, "All future college expenses for [Melissa and Brian] will be *capped* at this estimated University of Oregon rate for the appropriate academic year, *regardless of*

*the college they choose to attend*." (Emphases added.) Thus, as mother explains, the term "capped" signifies that the amount fixed by the University of Oregon rate applies *even if* the actual cost is higher, for example, if a child attends a more expensive school. As she puts it, "[I]f Brian Stocks or Melissa Stocks were to go to a school with an expense of attendance greater than that at the University of Oregon, the amount due for attendance at the University of Oregon would be the benchmark from which Father's 70% obligation would be determined, hence the amount due was not measured by the expense of attending another school but capped at the amount listed on the University of Oregon's website." That is a reasonable understanding of the sentence, considered in the context in which it is used.

The broader context of the 2014 judgment as a whole also tends to support the trial court's (and mother's) understanding of it. *See Harris*, 207 Or App at 746 ("Dictionary analysis suggests that the term might be ambiguous as used, but we must look to the context of related lease provisions to determine whether that possible ambiguity survives construction of the lease as a whole.").

Significantly, before setting out the details of the parties' agreement, the 2014 judgment plainly states: "It is the intent of the parties that there will no longer be an annual review. They have set the baseline for future support and college expenses based on their pro rata share of expenses." The trial court's interpretation of the judgment as establishing a fixed amount of expenses from which the parties' obligations for college costs would be calculated is entirely consistent with that expressed intent, that is, to eliminate the necessity for an annual review to determine the parties' respective obligations.[9] Father's is not.

Next, the parties included in Exhibit A of the judgment an example of how the agreement would operate.[10]

---

[9]   As noted above, 303 Or App at 55-56, the terms of the 2009 stipulated judgment specifically provided for an annual review of each child's projected college expenses, based upon the college attended and that school's published fee list.

[10]   Below, father argued that Exhibit A should not be considered because it was not explicitly incorporated by reference into the judgment. The trial court disagreed, and father does not challenge that ruling on appeal.

Among other things, at page five, it calculates the parties' pro rata share for Melissa for the 2014/2015 school year, using an estimated cost of $25,000, with the following explanation:

> "Melissa college expense 2014/2015 (based for example purposes on an 'estimated projection'

> "*Actuals*-2014/2015 U of O undergraduate/resident projected expense per website

> "Undergraduate cost of attendance - resident - College projected expense *(to use 2014/2015 U of O projected per website) for actual payments*, only changing the $25K to the amount on the U of O undergraduate/resident cost of attendance projection)"

(Emphases added.) That notation indicates, consistent with the trial court's interpretation of the judgment, that what the parties would actually be required to pay would be their respective pro rata share of the amount published on the University of Oregon's website for the given year.

In addition, the 2014 judgment provides that it will "supersede all previous orders/judgments regarding college expenses and child support" for Melissa and Brian. That clause clearly conveys the parties' intent that any previous agreement—such as their earlier agreement that scholarships, grants, and gifts could reduce their obligation—does not survive entry of the 2014 judgment.[11]

Thus, the text of the judgment, viewed as a whole, points preliminarily in favor of the trial court's conclusion that the parties agreed in the 2014 judgment to pay a percentage share of the University of Oregon's estimated cost each year as college expenses for their children. We must consider, however, whether the extrinsic evidence of the

---

[11] As noted above, father also asserts that the trial court improperly "insert[ed] what has been omitted," ORS 42.230, by finding a "minimum contribution" requirement that does not appear in the judgment itself. We disagree with that assessment. As we have explained, the establishment of a fixed amount from which the parties' payments are to be determined can be understood from the text and context of the judgment. Moreover, father's contrary interpretation would require the court to imply a requirement that scholarship funds would be deducted from the parents' obligation—a requirement that, given the "supersession" clause, appears to have been *specifically* omitted from the 2014 judgment.

circumstances underlying the formation of the agreement either renders its terms ambiguous or establishes that no ambiguity exists, reviewing the court's explicit and implicit findings of fact for any evidence in the record to support them. *Batzer Construction, Inc.*, 204 Or App at 318-19.

We pause here to note that father understands the trial court to have concluded that the 2014 judgment is unambiguous on its face, and he does not identify, as such, any "formation" evidence that would render the judgment unambiguous in his favor. Indeed, neither party acknowledges the distinction between extrinsic evidence of the circumstances of the contract's formation, considered at the first step in the *Yogman* analysis to determine whether an agreement *is* ambiguous, and extrinsic evidence that is available, at the second step, to *resolve* an ambiguity. *Harris*, 207 Or App at 738. Perhaps in part for that reason, the trial court's analytical path is not entirely clear from its letter opinion. However, the court held a three-day evidentiary hearing, towards the beginning of which it noted that the judgment "may have some ambiguities" and "the door [was] open for some potential testimony from either the parties or the mediator regarding the meaning of the document." In addition, the court references evidence of the circumstances leading up to the parties' agreement in its explanation of its ruling. Thus, we understand the trial court to have concluded that the judgment was unambiguous after considering its text, context, and the circumstances under which the agreement was made. Those circumstances confirm what the text, read in context, strongly suggests.

As noted above, evidence of the parties' negotiations before or during the formation of an agreement is evidence that may bear on the parties' intent and whether a disputed provision is ambiguous. *Harris*, 207 Or App at 738; *see also Alexander Loop, LLC v. City of Eugene*, 297 Or App 775, 787-88, 444 P3d 1116 (2019) (the content of discussions during contract negotiations qualifies as extrinsic evidence that may be considered under the first step of the *Yogman* analysis); *Batzer Construction, Inc.*, 204 Or App at 320 ("Evidence of a prior course of dealing is evidence of the circumstances underlying a contract.").

In this case, the trial court was presented with evidence concerning the parties' negotiations regarding child support and the payment of college expenses that led to the 2014 judgment. At the time, the parties were operating under the 2009 stipulated judgment—admitted into evidence at the hearing—which required them to renegotiate child support and college expenses each year. As described above, the 2009 agreement provided that, with respect to the nine months of the school year, "the *total expenses for the child will be agreed upon each May*, using the projected expenses for the school which the child plans to attend in the fall." (Emphasis added.)[12] That judgment further provided that the annual May agreement would determine each parent's relative income level "for purposes of computing 18-to-21 support," and the parents would "apply that pro rate prospectively for the next college year to the *total budget expense determined for the child*." (Emphasis added.) Thus, under the 2009 judgment, the parties had to agree each year on a "total budget expense" for the child, based on where the child was planning to attend college, *and* determine their pro rata contributions based on income.

The trial court found that there were "significant changes from the December 2009 judgment in the March 2014 judgment," most notably that "the parties agreed to have *no further annual reviews* for child support or college expenses" (which, as discussed above, is also expressly conveyed in the judgment); that they wanted to "stop the annual exchange of detailed information about their incomes and financial circumstances"; that "[p]rior agreements, and practices of the parties regarding utilizing different schools, or considering scholarships received by the children were not continued in the March 2014 judgment"; and that "[t]he children's resources were not discussed or considered in creating this budget." (Emphasis added; boldface omitted.) Those findings are supported by the record.

---

[12]  The 2009 judgment also included a cap:

"The parents' obligation pursuant to that nine-month projected expense amount will be capped by the comprehensive fee list published by that school, as of May of the preceding year, and in no event will the parents be obligated to pay for such expenses on comprehensive lists which are not Oregon state schools."

Soriano testified at length as to the parties' contract negotiations.[13] He stated that he met with mother and father twice, and he prepared several child support worksheets based on different income scenarios that he shared with them. He also reviewed numerous emails back and forth between the parties negotiating their agreement. Soriano testified that the parties

> "were trying to reach *** an agreement on this annual review and *both of them wanted not to come back in the form of an annual review; they wanted to get it done and accomplish it so that they wouldn't have to come back and go through this cost again of an annual review.*"

(Emphasis added.) Mother's testimony echoed Soriano's in that respect—she testified that her purpose was "[t]o have a binding agreement that we would follow that said what percent [father] was paying, what percent I was paying, that we would use the projected U of O website for payment for Melissa's and Brian's college." She also testified that she "wanted to get a final agreement that would never be modified."

Soriano also testified that, at his second meeting with the parties, father presented him with the parties' financial agreement (Exhibit A), and he prepared the 2014 judgment based on that agreement. Significantly, Soriano also testified that "[t]he issue of scholarships was not raised by either party" and that the parties did not discuss what would happen if a child's college costs were less than the University of Oregon's projected rates or if they were funded from other sources.

Based on that evidence, we conclude that the court's factual findings are supported by the record. Indeed, we do not understand father to dispute the point, except in one respect. Father identifies *other* testimony by Soriano indicating that Soriano's understanding of the parties' agreement was that "they were contributing 70 percent or their pro rata contribution to the actual costs of the school, but no

---

[13] Soriano apparently testified under an exception to the inadmissibility of confidential mediation communications that allows such testimony as necessary to prosecute or defend an enforcement action. In any event, neither party challenges the trial court's admission of the evidence.

more than what the University of Oregon charged." Father contends that that evidence is undisputed. However, as just described, that is incorrect. Although—to be sure—there are inconsistencies in Soriano's testimony, we assume, in accordance with our standard of review, that the court considered Soriano's testimony as a whole—along with other evidence in the record, including mother's testimony—and resolved the facts consistently with its determination that the parties had intended to base their obligation on the University of Oregon estimate each year, rather than on whatever actual costs the children might incur. *See Batzer Construction, Inc.*, 204 Or App at 322 (we must presume that the court found the historical facts consistent with its conclusion that contract language is unambiguous; thus, even if evidence is uncontroverted, we may presume that the court made implicit findings as to its credibility).

Otherwise, in support of his position, father simply relies on extrinsic evidence in the record that the parties had *historically* deducted scholarships and other awards from their college expense obligations under language that appeared in the original MSA and prior judgment.[14] He acknowledges that the issue of scholarships was *not* addressed in the 2014 judgment, but argues that "[t]here was no need to include such language." As we understand father's argument, that is because, in his view, the "primary purpose of the 2014 stipulated judgment was to eliminate the need for the parties' yearly exchange of income and other financial circumstance information, *by agreeing to a fixed division of college expenses*"—in other words, by settling what their respective shares would be—and the parties did not intend to change anything else, including how scholarships were to be handled. (Emphasis added.)

We reject that argument. As demonstrated above, the text explicitly states, and there is also extrinsic evidence in the record to support, that the parties wished to eliminate

---

[14] Father also argues that, prior to the parties' mediation, a different judge had advised them that "similar" language in the 2009 judgment required payment "only of actual college expenses." We disagree that the language is similar, but, in any event, we do not consider that argument because the trial court ruled that the judge's comments were inadmissible hearsay, and father does not challenge that ruling.

the annual May review required under the 2009 judgment altogether.[15] Agreeing to a fixed pro rata division (such as the 70/30 split the parties arrived at) would not accomplish that goal because the 2009 judgment also required the parties to *agree on* the *total expenses* for the child. Moreover, the parties expressly agreed that the 2014 judgment would "supersede all previous orders/judgments regarding college expenses and child support" for Melissa and Brian. Thus, it would be improper to impute into the 2014 judgment the requirement from earlier agreements that the parties' obligation to pay college expenses would be reduced by scholarships or other funds. *See Harris*, 207 Or App at 738 ("[E]xtrinsic evidence of [the circumstances under which an agreement was made] 'may only affect the interpretation *** when there is language in the agreement that is susceptible to being construed to carry out that intent.'" (Quoting *Criterion Interests, Inc. v. The Deschutes Club*, 136 Or App 239, 246, 9023 P2d 110 (1995).)). In short, there is ample evidence to support the trial court's implicit and explicit factual findings that, in entering into the agreement, the parties intended to settle the amount each would pay for college costs without having to renegotiate that amount each year, which necessarily included establishing a set amount from which their respective shares could be calculated.

Based on the text, context, and underlying circumstances, we conclude that the 2014 judgment is subject to only one plausible interpretation—the one arrived at by the trial court. Thus, the trial court did not err in concluding that the judgment was unambiguous.

Father's third assignment of error presents a slightly different issue; we discuss it only briefly. He contends that the trial court "erred in finding that the terms of the 2014 Judgment do not entitle Father to a credit based on payments made to [Melissa] for her Fall 2014 college expenses, when it is undisputed that the payments made were not, in fact, used for college expenses."[16] In its letter opinion, the

---

[15] Father testified that the principal purpose of mediation was "[t]o establish the pro rata share once and for all." However, the trial court was not required to credit that testimony or infer that it was the *only* purpose of the mediation.

[16] It is undisputed that Melissa enrolled at the University of Oregon for the fall 2014 term, but she withdrew before completing it.

court stated that there was "no basis to 'credit' either parent for the expenses they paid which were not utilized by Melissa as contemplated by the parties." Even assuming that father's argument was properly preserved, he presents no viable theory on appeal as to why the trial court erred. Father identifies no provision in the 2014 judgment that requires a carryover of payments from year to year, nor does he advance any other legal theory under which he would be entitled to have the payments he made applied as a credit toward his future obligation. He contends, in sum:

> "There was no reason the parties' agreement or the court judgment needed to spell out how to deal with the situation if payments made to a child *** were not used for the purpose or obligation they were made to satisfy. Given, as is uncontested here, the payments were made to satisfy Father's college expense obligation, but not so utilized, then a credit toward future obligation, as requested by Father, was clearly something available to the court to provide, and should have been ordered."

That is an insufficient basis for us to reverse the trial court.

As noted at the outset of this opinion, father also appeals a supplemental judgment awarding mother and Brian attorney fees and costs.[17] The trial court determined that mother had an unspecified statutory right to attorney fees and that her entitlement to fees was also supported by the parties' 1998 MSA incorporated in the judgment of dissolution. The court further concluded that Brian, as a child attending school, had a statutory right to attorney fees under ORS 107.135(8) and ORS 107.108. In his first and third assignments of error related to the attorney fees judgment, father agrees that both mother and Brian are entitled to some amount of attorney fees under ORS 107.135(8), but asserts that the court erred in not limiting the awards to the attorney fees arising out of his motion for modification of child support. Before explaining why we reject that argument, we pause to add some additional facts relevant to that question.

---

[17] The court denied father's request for attorney fees and declined to award fees and costs to Melissa, concluding that she would only be entitled to fees and costs if they were awarded as a sanction, which the court had specifically declined in its decision on the merits. Those rulings are not at issue on appeal.

After mother first filed her motion to enforce the 2014 judgment—alleging that father had failed to pay 70 percent of the University of Oregon estimated costs and monthly child support as required by the judgment—father filed a motion for modification of child support, requesting a downward deviation in monthly child support "based upon the resources available to the child." In his affidavit in support of the motion, father averred that he had learned from third parties about Brian's $24,000 scholarship ($6,000 per year) from the University of Oregon, and that, if mother's assertion in her motion to enforce was "correct, and the [2014] Judgment is valid," it would result in Brian having excess spending money, to which Brian had "no demonstrated need," and "it would be irresponsible for [father] as a parent to support such discretionary spending." For those reasons, he requested "that the Court modify my child support obligation so that I contribute on a pro rata basis to Brian's actual expenses." Mother subsequently amended her enforcement motion, clarifying her claims and also alleging a right to attorney fees and costs, citing, among other authorities, ORCP 68, ORS 107.104, ORS 107.135(8), paragraphs 18 and 24 of the MSA, and paragraph 6 of the 2014 judgment. For his part, Brian joined in mother's motion to enforce, opposed father's motion to modify, and requested attorney fees under ORS 107.135 and ORCP 68, and pursuant to paragraph 24 of the parties' MSA.

As briefly noted earlier in this opinion, the trial court considered mother's enforcement motion and father's motion to modify at the same hearing. 303 Or App at 58 n 3. During that hearing, children's counsel moved to dismiss father's motion on the ground that the 2014 judgment precludes modification except in the event of loss of employment. Father responded, in part, that, due to his scholarship, Brian would have $1,800 per month in spending money if mother's interpretation of the 2014 judgment was correct, and "there is nothing in this [2014 judgment] that prevents him from modifying on the basis of facts the parties could never have predicted in this case about where Brian would be once he went to school."

The court dismissed father's motion to modify, explaining that "[t]he basis that was negotiated between

father and mother as a basis to change child support and change this agreement is simply not alleged[.]" Responding to father's request to clarify its ruling, the court explained that Brian's scholarship was not an unanticipated and substantial change in circumstances to allow modification, because the agreement specifically limits what changes are allowed, and the fact that "a child might succeed well enough in school to get a scholarship" is not something that would be an unanticipated change. Father then informed the court that he was arguing his motion to modify "in the alternative"—that is, "if the Court is not inclined to back out the scholarship that then we would ask for the modification."

With that background in mind, we turn back to father's argument, reviewing for legal error. *St. Sauver and St. Sauver*, 196 Or App 175, 188, 100 P3d 1076 (2004). We begin with the relevant statutes. ORS 107.104 provides, in part:

"(1)   It is the policy of this state:

"(a)   To encourage the settlement of suits for marital annulment, dissolution or separation; and

"(b)   For courts to enforce the terms of settlements described in subsection (2) of this section to the fullest extent possible, except when to do so would violate the law or would clearly contravene public policy.

"(2)   In a suit for marital annulment, dissolution or separation, the court may enforce the terms set forth in a stipulated judgment signed by the parties, a judgment resulting from a settlement on the record or a judgment incorporating a marital settlement agreement:

"(a)   As contract terms using contract remedies;

"(b)   By imposing any remedy available to enforce a judgment, including but not limited to contempt; or

"(c)   By any combination of the provisions of paragraphs (a) and (b) of this subsection."

ORS 107.135(8) provides:

"*In a proceeding under subsection (1) of this section*, the court may assess against either party a reasonable

attorney fee and costs for the benefit of the other party. If a party is found to have acted in bad faith, the court shall order that party to pay a reasonable attorney fee and costs of the defending party."[18]

(Emphasis added.) A proceeding under subsection (1) of ORS 107.135, in turn, and as pertinent here, is a proceeding to "[s]et aside, alter or modify any portion of the [dissolution] judgment that provides for the *** support and welfare of the minor children and the children attending school[.]" ORS 107.135(1)(a).

Father argues that, because mother did not move to "set aside, alter or modify" a provision of the 2014 judgment, but, rather, sought to *enforce* the judgment, *see* ORS 107.104 (quoted above), she was only entitled to a portion of her fees—that is, those related to father's motion to modify. Father points out that ORS 107.104—although similar to ORS 107.135(15)[19] in providing for the enforcement of settlement agreements—does not contain a parallel fee provision like the one in ORS 107.135(8) and, therefore, "does not provide a basis for an award of attorney fees in an enforcement action."

---

[18] Although ORS 107.135 has been amended since the court entered the supplemental judgment at issue here, those amendments did not alter the text of subsection (8) and do not affect our analysis here.

[19] ORS 107.135(15)(a) provides, in part:

"It is the policy of this state:

"(A)  To encourage the settlement of cases brought under this section; and

"(B)  For courts to enforce the terms of settlements described in paragraph (b) of this subsection to the fullest extent possible, except when to do so would violate the law or would clearly contravene public policy.

"(b)  *In a proceeding under subsection (1) of this section*, the court may enforce the terms set forth in a stipulated order or judgment signed by the parties, an order or judgment resulting from a settlement on the record or an order or judgment incorporating a settlement agreement:

"(A)  As contract terms using contract remedies;

"(B)  By imposing any remedy available to enforce an order or judgment, including but not limited to contempt; or

"(C)  By any combination of the provisions of subparagraphs (A) and (B) of this paragraph."

(Emphasis added.) *See Berry and Huffman*, 247 Or App 651, 658, 271 P3d 128 (2012) (where party seeks to enforce provisions of stipulated dissolution judgment in context of a modification proceeding, operative statute is ORS 107.104 not ORS 107.135(15)).

Father is correct that ORS 107.104 does not itself provide for an award of attorney fees in an enforcement action under that statute. However, as he recognizes—and mother emphasizes—we have nonetheless held that, in some circumstances, fees can be awarded pursuant to ORS 107.135(8) for enforcement efforts under ORS 107.104. *Berry and Huffman*, 247 Or App 651, 271 P3d 128 (2012). In *Berry*, we asked the specific question "whether, when a party seeks, pursuant to ORS 107.104, to enforce some stipulated term of the dissolution judgment in the context of modification proceedings under ORS 107.135, attorney fees incurred in those enforcement efforts can be recovered under ORS 107.135(8)." *Id*. at 660. We concluded that the answer was "sometimes," and that

> "'sometimes' depends on the practical and legal relationship or nexus between the gravamen of the enforcement proceedings and the provision of the dissolution judgment sought to be enforced. *If the enforcement efforts are reasonably and materially related to the resolution of the modification dispute, the trial court may, subject to the exercise of discretion under ORS 20.075(1), award attorney fees under ORS 107.135(8)*. Conversely, if that nexus is lacking, there can be no fee entitlement."

*Id*. (emphasis added).

Here, father argues that mother's enforcement efforts (in which Brian joined) were not "'in the context of a modification proceeding,'" and therefore mother and Brian are not entitled to fees for those efforts under ORS 107.135(8), because (1) mother filed the enforcement action before father filed his modification motion; (2) the court dismissed his motion and continued with the enforcement action at the hearing; and (3) the court referenced mother's enforcement efforts in its ruling on attorney fees.

We are not persuaded. First, nothing about *Berry* compels the conclusion that the *order* of filing determines whether the requisite nexus between an enforcement action and a modification proceeding is satisfied. Although, to be sure, ORS 107.135(8) would not provide the basis for an award of fees if this was *only* an enforcement action, *Berry*, 247 Or App at 661 (noting that text of subsection (8) limits

attorney-fee entitlement to "'a proceeding under subsection (1)', *i.e.*, modification proceedings"), that is not the case here. Although the proceeding began with mother's enforcement action, father, in response, moved to modify related to the same provisions of the 2014 judgment mother sought to enforce, and the court considered and decided the two motions together. In those circumstances, we conclude that mother's motion was decided "in the context of modification proceedings."

Moreover, mother's enforcement motion was not "extraneous" or "unrelated" to the modification action. *Id*. at 661 ("extraneous matters, including unrelated enforcement efforts," decided concurrently with a motion to modify, do not give rise to an entitlement to fees under ORS 107.135(8)). As described above, in support of his motion to modify child support, father indicated that the particular catalyst for his motion was mother's efforts to enforce the provisions of the 2014 judgment related to child support and college expenses. At the hearing, father's arguments for modification, in many respects, mirrored his arguments in response to mother's motion to enforce the 2014 judgment; indeed, he indicated to the court that they were "alternative" arguments for the same result—essentially requiring him to pay his pro rata share of the child's *actual expenses*, "backing out" the scholarship funds. Thus, while perhaps not "*inextricably* intertwined," mother's enforcement motion was certainly "materially and reasonably related" to father's motion to modify. *Id*. at 660-61 (setting out the "materially and reasonably related" standard and describing as an example of the extreme end of the "nexus continuum" where fees are available a proceeding in which one spouse seeks to modify the requirements of a dissolution judgment and the other seeks to enforce the antimodification provisions of the same judgment because the two would be "inextricably intertwined"). In other words, we agree with mother that "the gravamen of the two proceedings is effectively indistinguishable."[20]

---

[20] The fact that the trial court *referenced* mother's enforcement efforts in its letter opinion on attorney fees does not tip the balance. This is not like *Berry*, where we concluded that, although "enforcement of a stipulated payment provision in a judgment of dissolution could be materially related to the disposition of cross-cutting motions to modify spousal support" so as to support an award of fees under ORS 107.135(8), it did not in that case, primarily because, in awarding

Father makes no other argument with respect to the court's award of attorney fees pursuant to ORS 107.135(8). Accordingly, we conclude that the trial court had discretion to award mother and Brian the full amount of their fees under that statute and therefore did not err in doing so. That conclusion obviates the need for us to address father's remaining assignment of error, which challenges the court's award of fees under the parties' MSA.

Affirmed.

---

fees, the court "expressly disclaimed the requisite nexus." That did not happen here; indeed, the court's letter opinion only reinforces the *relatedness* of the two actions.